883 A.2d 182

**Donald RIDGELY**

v.

**MONTGOMERY COUNTY, Maryland.**

**No. 580, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Sept. 15, 2005.

Diane A. Seltzer, Washington, DC, for Appellant.

Paul D. Raschke (Christina Bolmarcich, Bouland & Brush, LLC on the brief), Baltimore, for Appellee.

Panel: HOLLANDER, DEBORAH S. EYLER, and BARBERA, JJ.

DEBORAH S. EYLER, Judge.

The Circuit Court for Montgomery County granted summary judgment in favor of Montgomery County, the appellee, in an employment discrimination action based on disability brought by Donald Ridgely, the appellant.

The appellant poses five questions for our review, which we have consolidated into one: Was the circuit court's decision to grant summary judgment legally incorrect? [1] For the following reasons, we answer "no" to this question and shall affirm the judgment of the circuit court.

---

1. The questions as stated by the appellant are:
 1. Did the trial court ... err as a matter of law by granting summary judgment to Montgomery County and finding that there was no genuine issue of material fact on the issue of whether Montgomery County discriminated against Donald Ridgely on the basis of his disability?
 2. Did the trial court ... err as a matter of law by granting summary judgment to Montgomery County and finding that there was no genuine issue of material fact on the issue of whether Montgomery County regarded Donald Ridgely as disabled?
 3. Did the trial court ... err as a matter of law by granting summary judgment to Montgomery County and finding that there was no genuine issue of material fact on the issue of whether Montgomery County regarded Donald Ridgely as substantially limited in the major life activities of maintaining consciousness, maintaining motor control, maintaining balance, and working?
 4. Did the trial court ... err as a matter of law by granting summary judgment to Montgomery County and finding that there was no genuine issue of material fact on the issue of whether Montgomery County made an individualized assessment of Donald Ridgely's present ability to safely perform the essential functions of the full-duty Fire/Rescue Captain job?
 5. Did the trial court ... err as a matter of law by granting summary judgment in favor of Montgomery County on the issue of whether Montgomery County was required to demonstrate that Donald Ridgely constituted a direct threat to the health and safety of himself or others in order to justify its actions in removing him from his position as full-duty Fire/Rescue Captain?

## FACTS AND PROCEEDINGS

On October 6, 1980, the appellant was hired as a firefighter by the Montgomery County Department of Fire and Rescue Services ("the Department"). He was promoted several times and in 1990 attained the rank of Fire/Rescue Captain.

The appellant's duties as a captain included supervising shifts at the fire station, responding to fire and rescue incidents, assuming command of fire/rescue personnel at the incident scene, supervising fire investigations, repairing or overseeing repairs to the station, conducting employee training and evaluations, driving rescue vehicles, and providing administrative support to the Department. The position required periods of strenuous physical effort, such as scaling ladders while carrying 60 to 65 pounds of equipment, operating heavy equipment, and being exposed to extreme environments.

The Department requires firefighters to undergo annual medical examinations to ascertain their fitness for duty. The examinations are performed by doctors employed by Montgomery County's Fire and Rescue Occupational Medical Services ("OMS"). Upon performing a fitness examination, the examining doctor completes a "Health Status Report," which states whether the employee can perform full duties. The report discloses whether the employee has any medical impairments. The doctor indicates by boxes on the report any work restrictions he considers appropriate. The report is submitted to the Department, which makes the final decision about fitness and work restrictions. Ordinarily, the Department accepts the recommendations of OMS.

In February of 1997, the appellant began falling asleep during the day. He would fall asleep while driving, while performing sedentary activities, and once while driving his riding lawn mower. A few months later, the appellant noticed that his knees would buckle and his eyes would flutter when he laughed. He discussed these problems with his personal physician, who recommended sleep studies. A sleep study conducted in the fall of 1997 revealed that the appellant had

narcolepsy. He was then referred to a neurologist, Dr. Marc Raphaelson, for additional care. The appellant did not notify anyone at the Department of his condition or these developments.

In February of 1998, Dr. Raphaelson diagnosed the appellant with narcolepsy and related cataplexy and prescribed several medications.[2] The appellant immediately reported his diagnosis and the medications to the Department. He also gave the Department a "Medical Evaluation of Work Status Form" signed by Dr. Raphaelson. It stated that the appellant was qualified "to work in FULL DUTY status, without physical restriction."

On April 13, 1998, the appellant returned to Dr. Raphaelson for re-evaluation. He reported that his cataplexy had worsened, particularly when he played tennis or laughed, and that he required more medicine to remain awake. Dr. Raphaelson adjusted the appellant's medications. In his office note, Dr. Raphaelson wrote that the diagnosis was "narcolepsy with cataplexy that is poorly controlled."

The appellant saw Dr. Raphaelson for follow up on May 19. He reported that his cataplexy had significantly improved since his last visit, and that his knees did not buckle when he laughed. However, he felt "somewhat sleepy when driving to work." In his office note, Dr. Raphaelson wrote that the appellant's narcolepsy with cataplexy was "well-controlled."

On November 16, the appellant reported to Dr. Raphaelson that he often had difficulty driving to work due to sleepiness, and that his eyes fluttered and his knees buckled when he laughed. If he found a movie "tremendously funny" he would "literally become paralyzed." He was not bothered by sleepi-

---

**2.** Narcolepsy is a sleeping disorder characterized by "recurrent, uncontrollable, brief episodes of sleep, often associated with hypnagogic hallucinations, cataplexy, and sleep paralysis." *Smith v. Chrysler Corp.*, 155 F.3d 799, 802 (6th Cir.1998).

Cataplexy is a "sudden loss of muscle power following a strong emotional stimulus." *United States v. Fisher*, 289 F.3d 1329, 1332 n. 4 (11th Cir.2002).

ness or by cataplexy at work, however. Dr. Raphaelson adjusted the appellant's medications. In his office note, he wrote that the appellant's condition was "under better but incomplete control."

The appellant's next visit to Dr. Raphaelson was about a year later, on November 23, 1999. He reported that he continued to have cataplexy with a vigorous laugh. He complained of side effects from the medications. Dr. Raphaelson adjusted the appellant's medications and noted that the appellant's condition was "improved."

The appellant next saw Dr. Raphaelson on June 12, 2000. He reported that he was continuing to experience cataplexy upon laughing very hard. He would have to hold onto a pole or a wall when that happened to maintain his balance. He complained of side effects from the medications and of anxiety. Dr. Raphaelson adjusted the appellant's medications. In his office note, Dr. Raphaelson stated that the appellant's narcolepsy with cataplexy was "improved on current treatment."

In a follow-up appointment on June 26, the appellant complained to Dr. Raphaelson that he was "collapsing constantly." Dr. Raphaelson again adjusted the appellant's medications.

By April 18, 2001, when the appellant returned to Dr. Raphaelson, his condition was "essentially stable." He reported that his knees still got weak when he laughed, but he did not collapse. Dr. Raphaelson recommended that he continue his current medications.

In a follow-up visit on August 7, 2001, the appellant reported that his cataplexy was mild, and worse when he laughed. He continued to suffer from anxiety. Dr. Raphaelson adjusted his medications.

On October 30, 2001, the appellant reported to Dr. Raphaelson that he was falling asleep while doing paperwork and that his cataplexy was "still there, not real, real bad." Dr. Raphaelson concluded that the appellant's condition was "stable at moderately improved level," and again adjusted his medications.

On February 6, 2002, the appellant reported to Dr. Raphaelson that his condition was "stable or improved" and that it did not "affect him at work."

In 1998, 1999, 2000, and 2001, while under Dr. Raphaelson's care, the appellant passed his annual fitness examinations. On April 6, 2002, Dr. Francis J. Von Feldt, an employee of OMS, performed the appellant's annual fitness examination for that year. This was the first time Dr. Von Feldt performed the appellant's annual examination.

After performing the examination, Dr. Von Feldt submitted an inquiry to Dr. Raphaelson for more detailed information about the appellant's condition. Specifically, Dr. Von Feldt asked Dr. Raphaelson to provide a summary report of the appellant's narcolepsy and related cataplexy and to make recommendations about medical work restrictions. Dr. Von Feldt completed a "Health Status Report," placing the appellant on no duty status pending receipt of Dr. Raphaelson's report.

Dr. Raphaelson prepared a summary report dated April 15, 2002. On April 24, the appellant met with Dr. Von Feldt and gave him Dr. Raphaelson's summary report. In it, Dr. Raphaelson recommended no work restrictions. Dr. Raphaelson described the appellant's condition as follows:

He has responded well to medication treatment for narcolepsy.... [The appellant] has had occasional episodes when his knees would buckle, lasting for 10–15 seconds, associated with episodes of laughing or other stimuli. These events, at their peak, occurred up to six or seven times per week, and have diminished greatly during appropriate medication treatment. Over the last three months, for example, the patient has had approximately one similar episode, and it did not occur while working.

Since starting treatment in 1998, the patient has had no episodes when he was unable to perform job-related duties. [The appellant] has some leeway in use of his medications for narcolepsy, and he takes higher doses of medicines

during very long work shifts. There have been no episodes of sleep initiation interfering with work or leisure.

Dr. Raphaelson also suggested that the County perform a "maintenance of wakefulness test," to document the appellant's ability to stay awake, providing the County had a policy in place with guidelines for study interpretation.[3]

On May 1, Dr. Von Feldt performed a follow-up examination of the appellant and filled out a "Health Status Report." Dr. Von Feldt concluded that the appellant should remain on no duty status. Dr. Douglas Robinson, another physician at OMS, attended the examination.

On May 6, 2002, Dr. Von Feldt sent a memorandum to Dr. Robinson about the appellant's condition. He described the appellant's symptoms, noting that he had "severe somnolence since February, 1997," and had experienced episodes of cataplexy six to seven times per week in the form of knee buckling lasting ten to fifteen seconds at a time. Dr. Von Feldt further stated that the appellant took his medication "variably, based on subject considerations, not precisely as prescribed." Dr. Von Feldt felt these symptoms "represent[ed] a well-documented, proximate threat to self, coworkers and the public."

Dr. Von Feldt also noted in his May 6 memorandum that the appellant's symptoms implicated the National Fire Protection Association 1582, *Standard on Medical Requirements for Fire Fighters and Information for Fire Department Physicians* ("NFPA Standard"). Under paragraph 3–13.3(b) of that standard, the appellant's condition was a "Category B Medical Condition," analogous to a "seizure disorder."[4] Dr. Von Feldt

---

3. On July 3, 2002, the appellant wrote to Dr. Raphaelson to object to comments made in the April 15 summary report. Specifically, the appellant stated that his knees would only buckle for one second and only if he laughed extremely hard. The appellant asked the neurologist to correct these mistakes in writing.

4. Under the NFPA Standard, a "Category B Medical Condition" is "[a] medical condition that, based on its severity or degree, could prevent a person from performing as a member in a training or emergency

concluded on that basis that the appellant should not be allowed to operate County vehicles or work on scaffolding, ladders, roofs, or any other unprotected areas above ground or floor level.

On May 8, Dr. Von Feldt again wrote to Dr. Robinson, to report the substance of a discussion he had had with Dr. Raphaelson about the appellant's suitability for full duty. Dr. Raphaelson had recommended that the County compile work reports, solicited from other employees, and that he perform a maintenance of wakefulness test on the appellant.

On May 14, Dr. Von Feldt performed another examination of the appellant and completed a "Health Status Report," in which he recommended that the appellant be placed on light duty status. On that status, the appellant would be restricted from working at above floor level heights and from operating County vehicles.

The appellant began working on light duty status at the end of May 2002. He received his regular pay.

On May 21, Dr. Raphaelson completed a "Medical Evaluation of Work Status" form for the appellant, stating that he was qualified to work on full duty status.

On July 11, Dr. Robinson wrote to Roger Strock, Chief of the Department, recommending that the appellant remain on light duty status. Dr. Robinson opined that the appellant's chronic medical condition was "not acceptable" under the NFPA Standard.

On September 23, at the request of the Department, Dr. Robinson wrote to the appellant to summarize his reasons for rendering a final determination of "not acceptable." Dr. Robinson explained:

> I have determined that your cataplexy, which is not fully controlled despite the use of several prescription medications and regular follow-up visits with your neurologist,

---

operational environment by presenting a significant risk to the safety and health of the person or others."

poses a significant and immediate threat to you, your fellow fire-and-rescue members and the public being served during fire and rescue operations. Your cataplexy is of an unpredictable nature. *An attack can occur at any time.* Sudden loss of control of your muscles *for even a few seconds* can be disastrous during the rapid, physically demanding pace of fire-and-rescue operations.

(Emphasis in original.)

Dr. Robinson gave two hypothetical situations in which the appellant's condition could be dangerous:

1) You are involved in an aerial rescue on a ladder seventy feet from ground level, carrying a victim down to safety. Your legs buckle due to your cataplexy, causing both you and the victim to fall to your deaths. 2) You are driving any of the forty ton-plus emergency vehicles in operation. You lose control of your legs due to your cataplexy and, so, lose control of the emergency vehicle. This unpredictable circumstance involving a forty ton-plus emergency vehicle out of control causes significant injury or death to you and to members of your fire-and-rescue team and the public.

On October 30, Chief Strock wrote to the appellant informing him that, in light of OMS's recommendation, "you are no longer medically qualified to perform your job as a Fire/Rescue Captain." Chief Strock continued:

[I]t is necessary to inform you that you cannot continue working in a position for which you are not qualified.

Several options are available to employees who are medically unfit to perform the job for which they were hired. Such employees can apply for service-connected disability retirement or non-service-connected disability retirement. Employees can also resign, apply for an early or normal retirement (if eligible), or seek alternative placement in a different County job that they are medically able to perform. . . .

Your position as a Fire/Rescue Captain is vital to the delivery of fire and rescue services to the public. The need and demand for those services requires that the incumbent

of the position be medically able to perform. Therefore, if you do not diligently pursue one of the aforementioned options within the time periods specified herein, [the Department] will begin the process to terminate your employment.

Despite Chief Strock's letter, the appellant was not forced to retire, and continued working on light duty status.

On November 6, the appellant returned to Dr. Raphaelson for a follow-up visit. Dr. Raphaelson noted that the appellant's narcolepsy with related cataplexy was "subjectively stable and improved since May." [5]

In the meantime, the appellant retained counsel. On November 12, he wrote to Dr. Raphaelson, asking him to give his lawyer a complete report of his condition and a signed copy of a "Medical Evaluation of Work Status" form stating he is able to return to full duty status. The appellant instructed Dr. Raphaelson to state in his report that the appellant's knees only buckled when he laughed hysterically, that he had only experienced one episode of cataplexy in the past ten months while on medication, and that the duration of the episode was only one second.

Dr. Raphaelson responded by report dated November 13, 2002, opining that he did not consider the appellant "to be a significant risk to his health or safety," and that he was not aware of any limitations "preventing [him] from performing a position of fire/rescue captain." On November 20, Dr. Raphaelson completed a "Medical Evaluation of Work Status" form, stating that the appellant was qualified to work in full duty status.

The next day, November 21, 2002, the appellant filed a "Charge of Discrimination" with the Montgomery County

---

5. During this appointment, the appellant asked the neurologist to rewrite his notes to reflect corrections the appellant suggested. Dr. Raphaelson would not agree to rewrite any notes but did agree to make note of the appellant's suggested corrections.

Office of Human Rights. He alleged discrimination by the County in placing him on light duty status.

On February 7, 2003, in the Circuit Court for Montgomery County, the appellant filed suit against the County, alleging disability discrimination, in violation of Article 1, Chapter 27 of the Montgomery County Code (2001 ed.) ("MCC"). Specifically, he alleged that the County was "regarding [him] as ... disab[led]" because of his narcolepsy and related cataplexy, and was unlawfully discriminating against him on that basis.[6] He asked for back and front pay, compensatory damages, costs, attorney's fees, and reinstatement as a Fire/Rescue Captain on full duty status. He demanded a jury trial.

The County filed a timely answer.

In the meantime, on February 13, Dr. Von Feldt wrote to the appellant, stating he wanted to give the appellant "every opportunity to establish that [he could] safely perform all duties of [a] firefighter," and noting that Dr. Raphaelson had certified the appellant for full duty, but further stating that the neurologists's records "clearly document both cataplexy and sleep problems." Dr. Von Feldt asked the appellant to have Dr. Raphaelson answer several questions, including whether the appellant's condition was "substantially controlled" and if the appellant was capable of working at heights and operating heavy vehicles.[7]

Two months later, on May 6, the appellant returned to Dr. Raphaelson for a follow-up appointment. Dr. Raphaelson

---

6. The appellant also alleged discrimination on the basis of actual disability. He later abandoned that allegation.

7. On March 5 and March 6, the appellant wrote to Dr. Von Feldt, attempting to rebut Dr. Von Feldt's statements about his medical condition by relying on previous statements by Dr. Raphaelson and his own understanding of his condition.

Additionally, on June 20, the appellant sent a memorandum to Dr. Von Feldt, attempting to satisfy the doctor's concerns about his condition. The appellant complained that Dr. Von Feldt's actions were "clearly discriminatory."

noted that the appellant's narcolepsy with cataplexy was "well-controlled" and that the appellant "continue[d] to do well."

On July 2, Dr. Raphaelson wrote a letter to Dr. Craig Thorne, an independent contractor working for OMS, stating that the appellant was "capable of safe operation of heavy vehicles" and "capable of safe performance of duty while working at heights."

On July 8, Dr. Raphaelson spoke to Dr. Thorne, telling him that the appellant's symptoms were "rare and mild episodes of knee buckling only" and that he believed the appellant was not significantly at risk of harm, even with full firefighter duties.

The next day, Dr. Thorne performed a "follow-up medical evaluation" of the appellant. Dr. Thorne concluded that the appellant's narcolepsy and related cataplexy were "well-controlled." He reported the following recommendations:

1. [The appellant] appears not to be at significant risk with regard to his well-controlled narcolepsy and cataplexy. Although I cannot fully guarantee his safety, because of his current level of control and his only infrequent symptoms of knee buckling on occasion, provoked by laugher, and no indication that this affects his ability to perform his essential job functions, I would recommend that he is *medically fit for full duty.*

2. However, I would also recommend that he report to the clinic: 1. Immediately for any symptoms of alteration in level of consciousness and/or any loss of motor control, so that his personal safety in his job (and the safety of others) can be addressed, and 2. Any changes in his medications (to ensure no adverse side effects that may interfere with job performance).

3. He should continue to follow-up with his treating neurologist. I would recommend a twice-yearly evaluation and a letter from the neurologist attesting to the stability of his symptoms and his work capability.

(Emphasis in original.)

On August 1, Dr. Von Feldt wrote to Thomas Carr, the new Chief of the Department, stating that he had found the

appellant to be "Medically Acceptable with Qualifications." Dr. Von Feldt recommended a transition period of three months, during which the appellant would avoid working at heights and driving County vehicles.

The appellant returned to full duty status on October 5, 2003.

As part of discovery, the appellant, Dr. Robinson, Dr. Raphaelson, and Dr. Von Feldt, among others, were deposed in January and February of 2004.

The County moved for summary judgment on March 5, 2004, on the ground that, on the undisputed material facts, the appellant could not show he was regarded as disabled by the County. Specifically, the County argued that the appellant was not regarded as disabled because the County 1) placed him in another position; and 2) only regarded him as unable to work in one job—that of firefighter—and not as unable to engage in the major life activity of working. The County asserted further that it was justified in maintaining high fitness standards for its firefighters, as necessary to protect the public, and that it had acted prudently to assess whether, by continuing in his position at full duty, the appellant was posing a direct threat to himself or others.[8]

The appellant filed a timely opposition to the County's motion and request for a hearing. In his supporting memorandum of law, he argued that he had satisfied the *prima facie* case for discrimination. He argued that he could present evidence to establish that: (1) the County regarded him as substantially limited in the major life activities of working, maintaining consciousness, maintaining motor control, and maintaining balance, due to his narcolepsy and cataplexy, and hence regarded him as disabled; 2) he was qualified for his position and was not a direct threat because he had not experienced any incidents of cataplexy or narcolepsy while on

8. In support, the County attached portions of depositions, the "Health Status Reports," the "Medical Evaluation of Work Status" forms, and numerous letters of correspondence between the doctors, the Department, and the appellant, much of which we already have discussed.

the job; and 3) he was prohibited from serving in the position of Fire/Rescue Captain due to his narcolepsy and cataplexy.[9]

The County filed a reply memorandum. It argued that maintaining motor control, maintaining consciousness, and maintaining balance are not major life activities within the meaning of disability law. Alternatively, even if these activities are major life activities, the County did not regard the appellant's narcolepsy and cataplexy as substantially limiting them. The County also asserted that firefighting is not a class of jobs, and thus the appellant could not prove he was regarded as being substantially limited in the major life activity of working.

A hearing on the County's motion was held on May 6, 2004. At the conclusion of the hearing, the court found that there were no material facts in dispute and that the County was entitled to judgment as a matter of law. The court issued a brief written order granting summary judgment on May 11, 2004.

The appellant noted a timely appeal.

## STANDARD OF REVIEW

We review a circuit court's decision to grant summary judgment *de novo,* as it is a purely legal decision. *Livesay v. Baltimore County,* 384 Md. 1, 9, 862 A.2d 33 (2004); *Nesbit v. Govt. Employees Ins. Co.,* 382 Md. 65, 72, 854 A.2d 879 (2004). We determine whether the circuit court properly concluded that there was no dispute of material fact, and if so, whether the circuit court's decision that the moving party was entitled

---

9. In support of his motion, the appellant provided an affidavit attesting that, "[s]ince February 1998, the only cataplexy I have experienced (with the exception of June 18, 2000, which was six days after I went off Anafranil), was my knees buckling approximately one second while laughing hysterically." He further attested that he did not laugh while working and had "never experienced any problems with narcolepsy or cataplexy while engaged in [his] work duties as a full duty Fire/Rescue Captain."

The appellant also attached much of the same documentation and correspondence that the County had attached to its motion.

to summary judgment was legally correct. *See* Md. Rule 2–501(f); *Johnson v. Mayor and City Council of Baltimore City,* 387 Md. 1, 5, 874 A.2d 439 (2005); *Coroneos v. Montgomery County,* 161 Md.App. 411, 422, 869 A.2d 410 (2005).

## DISCUSSION

### (a)

An iteration of the law of disability discrimination is necessary before we discuss the issues on appeal.

The appellant alleges that he was discriminated against on the basis of a disability, in violation of Article 1, Chapter 27 of MCC. MCC section 27–19(a) provides, in relevant part, that, "because of the ... disability of a qualified individual, or because of any reason that would not have been asserted but for the ... disability," an employer [10] may not:

(A) fail or refuse to hire, fail to accept the services of, discharge any individual, or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment; or

(B) limit, segregate, or classify employees in any way that would deprive or tend to affect adversely any individual's employment opportunities or status as an employee.

The MCC also defines "disability" as "a physical or mental impairment that substantially limits one or more of an individual's major life activities, a record of having such an impairment, being associated with an individual with a disability, or being regarded as having such an impairment." MCC § 27–6(c).[11]

---

**10.** An "employer" is defined by the MCC as "any person who employs one or more individuals in the County, either for compensation or as a volunteer" and includes, *inter alia,* "Montgomery County and its instrumentalities and agencies." MCC § 27–6(g).

**11.** A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual holds or seeks." MCC § 27–6(v).

Moreover, Chapter 27 of the MCC is modeled after the Americans with Disabilities Act ("ADA"), which is codified at 42 U.S.C. § 12101 *et seq.*[12] *See* MCC § 27–1(b) ("The prohibitions in this article are substantially similar, but not necessarily identical, to prohibitions in federal and state law."); *Cohen v. Montgomery County Dept. of Health and Human Services,* 149 Md.App. 578, 591, 817 A.2d 915 (2003) (relying on decisions interpreting the ADA to interpret provisions of Montgomery County's discrimination law). The ADA definitions of "disability" and "qualified individual with a disability" are almost identical to definitions of those terms under the MCC. *See* 42 U.S.C. §§ 12102(2), 12111(8). Indeed, both parties agree that we can look to federal decisions interpreting the ADA for guidance in interpreting the MCC.

■ The *prima facie* case for disability discrimination is three-pronged. An individual must show: (1) he has a disability within the meaning of the MCC (or ADA); (2) notwithstanding the disability, he was otherwise qualified for the employment or benefit, with or without "reasonable accommodation"[13]; and (3) he was excluded from the employment or benefit solely on the basis of his disability. *E.g. Martinson v. Kinney Shoe Corp.,* 104 F.3d 683, 686 (4th Cir.1997); *Doe v. Univ. of Maryland Med. Sys. Corp.,* 50 F.3d 1261, 1264–65 (4th Cir.1995).[14]

---

**12.** The ADA prohibits discrimination by covered entities against qualified individuals with a disability. Specifically, it provides that no covered entity "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

**13.** "Reasonable accommodation" is defined in the MCC as "any modifications necessary to make an environment suitable for a disabled person, without undue hardship or significant risk to any person's health or safety." MCC § 27–6(bb). The definition of "reasonable accommodation" under the ADA is similar. *See* 42 U.S.C. § 12111(9).

**14.** Because we conclude that the appellant failed to satisfy the first prong of the *prima facie* case for disability discrimination—that he has or was regarded as having a disability—we need not discuss in detail

In *Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998), the Supreme Court articulated a three-step analysis for evaluating the first prong of the *prima facie* case for disability discrimination. The first consideration under the analysis is whether the plaintiff has a physical or mental impairment. 524 U.S. at 631, 118 S.Ct. 2196. Second, the court must identify a major life activity that might be limited by the impairment. *Id.* Finally, the court must consider whether the impairment substantially limits that major life activity. *Id.*

A "physical or mental impairment" under the MCC is "(A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-uninary; hemic and lymphatic; skin; and endocrine; or (B) any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." MCC § 27–6(c). In the instant case, it is undisputed that the appellant's narcolepsy and cataplexy constitute "impairments" within the meaning of the MCC.

———

the requirements for the second and third prongs, as without satisfying the first prong he cannot possibly satisfy the entire *prima facie* case. *See Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 494, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (holding that a complaint alleging that two job applicants were "regarded as" disabled by an employer was properly dismissed because the job applicants had not alleged and could not demonstrate that the employer's job requirements reflected a belief that the applicants were substantially limited in a major life activity and thus not addressing the remainder of the *prima facie* case for disability discrimination); *Halperin v. Abacus Technology Corp.,* 128 F.3d 191, 198 & n. 9 (4th Cir.1997), (noting that, even if the court believed that Halperin was "otherwise qualified," and thus satisfied the second element of the *prima facie* case, because Halperin had "failed to demonstrate that he has a disability," he could not make out the *prima facie* case for disability discrimination), *abrogated on other grounds by Baird ex rel. Baird v. Rose,* 192 F.3d 462 (4th Cir.1999). *Cf. Simms v. City of New York,* 160 F.Supp.2d 398, 405 (E.D.N.Y.2001) (explaining that it was analyzing the "otherwise qualified" prong of the *prima facie* case for disability discrimination because the plaintiff in that case had, as a matter of law, established that he had a disability).

234

■ The term "major life activities" also has been defined by the MCC.[15] *See* MCC § 27–6(r). The term refers to "those activities that are of central importance to daily life," *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 197, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), that " 'the average person in the general population can perform with little or no difficulty.' " *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 274 (4th Cir.2004) (quoting *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir.1999)). Major life activities include, but are not limited to, the following functions: "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." MCC § 27–6(r); *Toyota, supra*, 534 U.S. at 195, 122 S.Ct. 681 (citing 45 C.F.R. § 84.3(j)(2)(ii)); *Bragdon, supra*, 524 U.S. at 638–39, 118 S.Ct. 2196. In the instant case, the appellant has identified the following as major life activities affected by his impairments: working; maintaining consciousness; maintaining motor control; and maintaining balance.[16]

The third step in the analysis is to determine whether the impairment substantially limits the asserted major life activities. Neither the ADA nor the MCC has defined the term "substantially limits." However, the Equal Employment Opportunity Commission ("EEOC")[17] has codified regulations

---

15. The term "major life activities" was originally defined by Health and Human Services in a regulation promulgated to effectuate section 504 of the Rehabilitation Act of 1973. *See* 45 C.F.R. § 84.31(j)(2)(ii). However, because the ADA must be interpreted as granting "at least as much protection as provided by the regulations implementing the Rehabilitation Act," this regulation also is used to implement the ADA. *Bragdon, supra*, 524 U.S. at 632, 118 S.Ct. 2196.

16. We will address later in our discussion whether any of these are actually major life activities and, if so, whether the appellant put forth sufficient evidence that the County regarded his impairments as substantially limiting any of them.

17. The EEOC is required to issue regulations to carry out certain provisions of the ADA. *See* 42 U.S.C. 12116. "[C]ourts normally defer to the[se] ... regulations ... except where they are viewed to be contrary to law." *E.E.O.C. v. Browning–Ferris, Inc.*, 262 F.Supp.2d 577, 583 n. 7 (D.Md.2002).

interpreting the term "substantially limits" as, *inter alia*, "[u]nable to perform a major life activity that the average person in the general population can perform"; or "[s]ignificantly restricted as to the condition, manner[,] or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii); *Sutton, supra*, 527 U.S. at 480, 119 S.Ct. 2139 (citing favorably these regulations); *Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, 643 (2nd Cir.1998) (same). Moreover, the Supreme Court has explained that an impairment that "interfere[s] in only a minor way with the performance of [a major life activity]" does not "qualify[ ] as [a] disabilit[y]." *Toyota, supra*, 534 U.S. at 197, 122 S.Ct. 681. *Cf. Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 565, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999) (explaining that a "mere difference" cannot amount to a "significant restrict[ion]" and thus cannot satisfy the ... interpretation of "substantially limits").[18]

---

**18.** Along with its regulations, the EEOC also issues "Interpretive Guidelines." These guidelines are afforded varying degrees of deference among courts. *See Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 783 n. 3 (3rd Cir.1998) (noting that the Third Circuit affords these guidelines "a great deal of deference"). One such guideline provides that a court should analyze whether an individual is substantially limited in the major life activity of working only after considering whether the individual is substantially limited in any other asserted major life activity. 29 C.F.R. Pt. 1630, App. § 1630.2(j). While the Supreme Court has not considered whether this guideline is correct, at least two Federal Circuits have cited it with approval and have followed this approach. *See Mondzelewski, supra*, 162 F.3d at 784 & n. 4; *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 & n. 10 (5th Cir. 1995).

In his reply brief to this Court, the appellant urges us to use the approach outlined in the guideline. Assuming, without deciding, that this approach is the proper one for analyzing "regarded as" claims, we shall analyze the appellant's claims that he was substantially limited in the major life activities of maintaining consciousness, maintaining motor control, and maintaining balance before we analyze whether he was substantially limited in the major life activity of working.

In determining whether an impairment is "substantially limiting," the EEOC and the Supreme Court have suggested that the following factors are to be considered: "[t]he nature and severity of the impairment; [t]he duration or expected duration of the impairment; and [t]he permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment." *Toyota, supra,* 534 U.S. at 196, 122 S.Ct. 681 (quoting 29 C.F.R. § 1630.2(j)(2)(i)-(iii)); *see also Colwell, supra,* 158 F.3d at 643.

In the case at bar, the appellant argues that he meets the first prong of the *prima facie* case for disability discrimination—that he has a disability within the meaning of the MCC—because the County "regarded [him] as" disabled. Under the MCC, an individual can show that he was "regarded as" having a disability in one of three ways. *See* 45 C.F.R. § 84.3(j)(2)(iv). In the instant case, the appellant has chosen the first of these three ways: that he is "regarded as" having a disability because the County mistakenly believed that an actual physical or mental impairment of the appellant's substantially limits one or more of his major life activities. *Id. See also Sutton, supra,* 527 U.S. at 489, 119 S.Ct. 2139 (noting that one way an individual can satisfy the "regarded as" definition of disability under the ADA is by showing that the covered entity "mistakenly believes that [he] has a physical impairment that substantially limits one or more major life activities"); *Bragdon, supra,* 524 U.S. at 631, 118 S.Ct. 2196.

It is important to bear in mind that the MCC and the ADA were designed to " 'assure[ ] that truly disabled, but genuinely capable, individuals will not face discrimination in employment because of stereotypes about the insurmountability of their handicaps.' " *Halperin, supra,* 128 F.3d at 200 (quoting *Forrisi v. Bowen,* 794 F.2d 931, 934 (4th Cir.1986), which interpreted the Rehabilitation Act, on which the ADA is based). Accordingly, "if the statutory protections available to those truly handicapped could be claimed by anyone whose disability was minor and whose relative severity of impairment was

widely shared[,]" the purpose of the ADA and MCC would be frustrated. *Forrisi, supra,* 794 F.2d at 934.

The caselaw setting forth the requirements for satisfying the "regarded as" prong of a disability discrimination claim, discussed above, adhere to and reflect this purpose. Indeed, the *prima facie* case is designed to distinguish between a situation in which an individual is in fact being "regarded as disabled within the meaning of the ADA" and a situation in which an employer has merely deemed an individual "unqualified for a particular job because of a limiting physical [or mental] impairment," as the latter is not actionable under the ADA. *Schuler v. SuperValu, Inc.,* 336 F.3d 702, 705-06 (8th Cir.2003) (internal quotation marks omitted). On these two different situations, the Supreme Court has explained:

> By its terms, the ADA allows employers to prefer some physical attributes over others and to establish physical criteria. An employer runs afoul of the ADA when it makes employment decisions based on a physical or mental impairment, real or imagined, that is regarded as substantially limiting a major life activity. Accordingly, an employer is free to decide that physical characteristics or medical conditions that do not rise to the level of an impairment—such as one's height, build, or singing voice—are preferable to others, *just as it is free to decide that some limiting, but not substantially limiting, impairments make individuals less than ideally suited for a job.*

*Sutton, supra,* 527 U.S. at 490–91, 119 S.Ct. 2139 (emphasis added).

■ Moreover, when an employer has valid requirements in place that employees must meet and the employer fails to hire or keep an employee who does not meet these requirements, such a situation "does not establish a claim that [the employer] regards [the person who does not meet the requirements] as being substantially limited in [a] major life activity." *Id.* at 490, 119 S.Ct. 2139. To best explain this concept, a discussion of *Deas v. River West, L.P.,* 152 F.3d 471 (5th Cir.1998), is instructive.

Deas applied for a position as an "Addiction Technician" in a substance abuse program. 152 F.3d at 474. On a health history questionnaire, she disclosed that she suffered from "epilepsy (fits, seizures)" in the past. *Id.* She was approved for hire. Within a few weeks on the job, while she was still in the employee orientation program, Deas had a seizure. Dr. Dixon, the medical doctor of the substance abuse program, witnessed the seizure and described Deas as becoming "verbally unresponsive and seem[ing] to lose awareness of her surroundings for a brief time." *Id.* Dr. Dixon noted that the seizure lasted "only a few seconds." *Id.* That same day, Dr. Dixon was approached by another employee of the program, who said he saw Deas have a seizure lasting "several minutes," during which she "appeared to lose all awareness of her surroundings and was verbally uncommunicative." *Id.*

On this evidence, Dr. Dixon concluded that Deas would not be able to satisfy her duties as an addiction technician and discharged her. Dr. Dixon told Deas that she was being fired because of her seizures. Deas filed suit against the program, alleging that Dr. Dixon violated the ADA because she regarded Deas as disabled when she discharged her because of the seizures. The United States District Court for the Middle District of Louisiana granted summary judgment for the employer.

On appeal, noting that it was uncontested that Deas's seizures constituted an impairment and that Dr. Dixon had terminated Deas's employment because of the seizures, the United States Court of Appeals for the Fifth Circuit explained:

> [T]he question on this appeal boils down to whether Deas produced sufficient evidence for a reasonable trier of fact to find that Dr. Dixon perceived her seizures as constituting a substantially limiting impairment. In other words, to have made a *prima facie* showing of disability, Deas must have produced sufficient evidence for a reasonable trier of fact to conclude that Dr. Dixon perceived her as having an 'impairment' *and* that this impairment, if it existed as perceived by

Dr. Dixon, would have substantially limited one or more of Deas's major life activities.

*Id.* at 476 (internal footnote omitted) (emphasis in original).

The court then reviewed Deas's arguments on this issue. Pertinent to the instant appeal, Deas argued that because Dr. Dixon perceived Deas as suffering from seizures, she also must have regarded her as substantially limited in the major life activities of seeing, hearing, and speaking; accordingly, her discharge was based "solely on [Dr. Dixon's] perception that[,] in the event of a seizure, [she] would be unable to see, hear, or speak to the patients or other workers[.]" *Id.* at 479. The court noted that Deas offered no other evidence that Dr. Dixon regarded her as substantially limited in the major life activities of seeing, hearing, and speaking.

The court found that on this evidence, as a matter of law, Deas did not show that Dr. Dixon regarded her as " '[s]ignificantly restricted as to the condition, manner[,] or duration' " under which she could see, hear, or speak. *Id.* at 480 (quoting the definition of "substantially limits" in 29 C.F.R. § 1630.2(j)(1)). The court explained that Deas's evidence, at most, showed that, when Deas experienced a seizure, Dr. Dixon perceived her as limited in her ability to see, hear, and speak for "a few seconds," which was not a "significant restriction" as to the "condition, manner, or duration" under which Deas could "see, hear, and speak in comparison to an average member of the general population." *Id.* Thus, the court held that, on this evidence, no rational trier of fact could find that Dr. Dixon perceived Deas to be substantially limited in the major life activities of seeing, hearing, and speaking.

*See also Amendola v. Henderson,* 182 F.Supp.2d 263, 276 (E.D.N.Y.2001) (holding that a plaintiff had failed to make a *prima facie* case for a "regarded as" claim under the Rehabilitation Act because the employee's evidence showed only that the employer perceived him as "merely requiring post-operative recovery time following his foot surgeries between April and June .... [and such] evidence is insufficient to permit the inference that [the employer] perceived [the employee] as

having an impairment that substantially limited him from one or more major life activities").

**(b)**

With this understanding of the law, we now turn to the appellant's contentions.

i.

The appellant first contends the court erred in granting summary judgment to the County on the ground that he did not satisfy the first prong of the *prima facie* case for a "regarded as" claim. He argues that he satisfied the first prong because "there is no dispute that the County regarded [him] as being disabled due to his narcolepsy and cataplexy." The appellant seems to argue that simply because he suffered an adverse employment decision at the hands of the County, which acknowledged that its reason for making such a decision was because of the appellant's narcolepsy and cataplexy, he has presented evidence sufficient to satisfy the "regarded as" prong of the *prima facie* case.

█ Merely showing that the appellant suffered an adverse employment decision, even when it is acknowledged that the decision was made based on the appellant's narcolepsy and cataplexy, is not sufficient to satisfy the "regarded as" prong of the *prima facie* case for disability discrimination. As our discussion of *Deas, supra,* makes clear, to satisfy the "regarded as" prong, an individual must put forth sufficient evidence for a reasonable trier of fact to conclude that the employer perceived the employee as having an impairment and that that impairment, if it existed as perceived by the employer, would have substantially limited one or more of the employee's major life activities. Indeed, the appellant's later contentions, that the County regarded him as being substantially limited in the major life activities of working, maintaining consciousness, maintaining motor control, and maintaining balance, belie his threshold argument that the "regarded as" prong only required a showing that he suffered an adverse employment decision because of his impairment.

ii.

■ The appellant next contends the court erred in granting summary judgment to the County because he demonstrated that there was a genuine dispute of material fact as to whether the County regarded him as disabled in the major life activities of maintaining consciousness, maintaining motor control, and maintaining balance. Apparently believing that an "assertion" that the County regarded him as substantially limited in these major life activities was sufficient, he offers no evidence to support this argument. He cites *Felix v. New York City Transit Authority*, 324 F.3d 102 (2nd Cir.2003), for the proposition that "maintaining motor control is a major life activity." He further suggests that merely because there is no case law establishing that maintaining consciousness and balance are major life activities *per se* does not mean that they are not.

The County responds that what the appellant has characterized as "major life activities," the Supreme Court suggested in *Toyota, supra,* 534 U.S. at 195, 122 S.Ct. 681, are actually "physical impairments." However, even assuming that these functions are in fact major life activities,[19] the County argues that the appellant failed to produce any evidence that he was perceived as being substantially limited as to any of them. Furthermore, the County argues that its evidence showed that Doctors Von Feldt and Robinson did not perceive the appellant's limitations to be "severe, frequent, or substantial," but rather to be "unpredictable." Thus, the County was not regarding the appellant as being substantially limited in any major life activity; rather, it was merely recognizing that his non-disabling impairments posed an unacceptable risk for fire and rescue work.

■ Whether the appellant was regarded as having an impairment that substantially limited a major life activity is a

---

**19.** The County conceded in oral argument to this Court that maintaining motor control, maintaining balance, and maintaining consciousness were all major life activities.

mixed question of law and fact. *Bridges v. City of Bossier*, 92 F.3d 329, 333 (5th Cir.1996). First, as to the law, the appellant has only cited one case, *Felix, supra*, 324 F.3d 102, which he asserts holds that maintaining motor control is a major life activity. The *Felix* Court did not so hold. In *dicta*, it reasoned that being unable to maintain motor control is an impairment—not a major life activity. Furthermore, the appellant has cited no cases holding that his other asserted major life activities—maintaining consciousness and maintaining balance—are in fact major life activities.

Other than the County's conclusion that the appellant could no longer serve in the position of Fire/Rescue Captain because he did not meet the threshold requirements for that position under the NFPA Standard (which as we have already explained, under *Sutton, supra*, and *Deas, supra*, is not insufficient), the appellant has failed to make the *prima facie* showing that the County regarded him as being substantially limited in the major life activities of maintaining consciousness, maintaining balance, and maintaining motor control.

Even if we assume—without deciding—that maintaining consciousness, balance, and motor control are major life activities, the appellant still falls short on the fact portion of the issue. He has put forth no evidence on the summary judgment record to support an inference that the County regarded him as substantially limited in any of these asserted major life activities.[20]

---

**20.** Without tying it to the alleged major life activities of maintaining consciousness, maintaining motor control, and maintaining balance, the appellant mentions in his brief that the fact that the County referred him for fitness examinations is evidence that it regarded him as disabled. This evidence could not in and of itself support that inference, given that the County requires annual fitness examinations of all firefighters. *See Tice v. Centre Area Transp. Authority*, 247 F.3d 506, 516 (3rd Cir.2001) (explaining that evidence that an employer requested an employee to undergo an independent medical examination did not by itself suggest that the employer regarded the employee as disabled); *Krocka v. City of Chicago*, 203 F.3d 507, 515 (7th Cir.2000) (explaining that the City did not regard a police officer as disabled by asking him to undergo a medical examination, as it was reasonable for the City to

As it was the appellant's burden to put forth evidence that the County regarded him as substantially limited in his asserted major life activities of maintaining consciousness, motor control, and balance, and he did not meet that burden, the trial court correctly went on to consider whether he put forth evidence that could satisfy the *prima facie* case for a "regarded as" claim in the major life activity of working.

### iii.

The appellant further contends the court erred in granting the County's motion for summary judgment on the ground that he did not demonstrate a genuine dispute of material fact on the issue of whether the County regarded him to be substantially limited in the major life activity of working. Specifically, he suggests that the County regarded him as "disabled from a class of jobs or a broad range of jobs in various classes," and thus regarded him as substantially limited in the major life activity of working. The appellant cites the following evidence in support of this argument:

— That while he was placed on light duty status, he was precluded from appointment to any "Station Commander" position for which he applied, because only full duty employees can serve in such a position.

— That the County did not seek to place him in a position for which he was qualified; rather, it "threatened, in writing, to terminate him if he did not resign, retire, or find alternative employment."

— Dr. Robinson's deposition testimony that he was prohibited from "[a]ny job that required him to be on scaffolding or heights or driving motor vehicles or operating ... vehicles for the county."

— Dr. Robinson's deposition testimony, when asked to give examples of jobs that he would be prohibited from doing, that the appellant could not be "an able-bodied fire fighter in any of the units going out to fires and operating in

---

evaluate the officer's fitness for duty after it learned that he was suffering from severe depression).

his capacity as an officer or non-officer personnel; in other words, working directly in fire and rescue."

— Dr. Von Feldt's deposition testimony that the appellant would be prohibited from jobs requiring "exceptional alertness."

— Dr. Von Feldt's deposition testimony, when asked which jobs the appellant could not perform, that he could "perform almost any job that I can imagine except those that require the extraordinary capabilities of an emergency worker like firefighter or police or pilot . . . of an airplane."

The appellant also cites *Simms, supra,* 160 F.Supp.2d 398, for the proposition that firefighting is considered a "class of jobs." Thus, the appellant argues, by removing him from the position of Fire/Rescue Captain, the County regarded him as substantially limited in the major life activity of working.

The County responds that none of its actions evidenced a belief on its part that the appellant's narcolepsy and cataplexy substantially limited him in the major life activity of working. First, the County points out that the overwhelming majority of courts have held that an employer's conclusion that a person is not qualified for the single position of firefighter is *not* a substantial limitation on the major life activity of working. Second, citing caselaw from several federal courts of appeal, the County argues that, because of the unique demands of firefighting, non-disabling impairments can render a person not fit for the job.[21] Finally, the County asserts that the evidence in the summary judgment record supported the grant of summary judgment: the testimony of Doctors Von Feldt and Robinson showed that it did not regard the appel-

---

**21.** The County explains that evidence that it referred the appellant for a Fitness for Duty Examination does not show that it was regarding him as disabled; rather, at most, it shows doubt as to his fitness for the job of Fire/Rescue Captain.

Also, the County points out that its reliance upon the NFPA Standard further shows that it regarded the appellant as having an impairment that prevented him from meeting the exceptional and unique qualifications for the position of Fire/Rescue Captain, not that it regarded him as disabled.

lant as unfit for a broad range or class of jobs but only as unfit for a narrow class of firefighting jobs; and the appellant remained employed by the County on light duty status before he was returned to his position as Fire/Rescue Captain.

■ An employer regards a person as substantially limited in his ability to work if the employer perceives him to be "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills[,] and abilities." 29 C.F.R. § 1630.2(j)(3)(i); *Toyota, supra,* 534 U.S. at 200, 122 S.Ct. 681; *Cline v. Wal–Mart Stores, Inc.,* 144 F.3d 294, 303 (4th Cir.1998). Furthermore, "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i); *Murphy v. United Parcel Service, Inc.,* 527 U.S. 516, 523, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999); *Cline, supra,* 144 F.3d at 303. Moreover, "one must be precluded from more than one type of job, a specialized job, or a particular job of choice." *Pollard v. High's of Baltimore, Inc.,* 281 F.3d 462, 471 (4th Cir.2002) (quoting *Sutton, supra,* 527 U.S. at 491–92, 119 S.Ct. 2139).

The overwhelming majority of cases that have addressed the issue have held that the inability to perform the job of firefighter is not a substantial limitation on the major life activity of working. In *Bridges, supra,* the United States Court of Appeals for the Fifth Circuit held that an applicant who was denied a position as a firefighter because he suffered from mild hemophilia had not been regarded as disabled in the major life activity of working, even though the City's physician had concluded that his condition prevented him from being qualified for positions involving "routine exposure to extreme trauma" and, under City rule, all emergency medical technicians and paramedics were required to be firefighters as well. 92 F.3d at 333–35 & n. 9. Reasoning, under 29 C.F.R. § 1630.2(j)(3)(i), that a "broad range of jobs" must "impl[y] more than two types [of jobs]," the court concluded that "neither firefighters alone, nor even firefighters in conjunction

with municipal [emergency medical technicians] and paramedics who must also serve as backup firefighters . . . constitutes a broad range of jobs." *Id.* at 334. The court also reasoned that being excluded from the position of firefighter for the City did not exclude the applicant from a "class of jobs." *Id.* (citing 29 CFR § 1630.2(j)(3)(ii)(B), which defines a "class of jobs" as "jobs utilizing similar training, knowledge, skills or abilities, within that geographical area from which the individual is also disqualified because of the impairment").

*See also Shipley v. City of University City, Missouri,* 195 F.3d 1020, 1023 (8th Cir.1999) (affirming summary judgment for the City because the record "indicate[d] that Shipley was able to perform a variety of jobs, and [the] City is entitled to summary judgment because it regarded him only as unable to perform the job of firefighter"); *Smith v. City of Des Moines, Iowa,* 99 F.3d 1466, 1474 (8th Cir.1996) (affirming grant of summary judgment for the City because, although the City regarded Smith as unable to perform the duties of a firefighter, being unable to work at "the job of [one's] choice" is not a substantial limitation on the major life activity of working); *Welsh v. City of Tulsa, Oklahoma,* 977 F.2d 1415, 1416–20 (10th Cir.1992) (holding that Welsh had failed to show that he had been regarded as substantially limited in the major life activity of working, as he had put forth no evidence that the employer who found him unfit for the job of firefighter also viewed him as unfit for a "wide range of jobs").

*But see Simms, supra,* 160 F.Supp.2d at 405 (concluding that because Simms alleged that he was precluded from full duty service as a firefighter and was denied a position as a First Line Supervisor in the Training Division of the Department, because such positions were only open to full duty firefighters, Simms was therefore precluded from more than one type of job within the Department and thus, as a matter of law, was regarded as disabled by the Department).

██ Accordingly, under the weight of the caselaw, being deemed unfit for the position of firefighter does amount to being unfit for a "broad range of jobs in various classes" or a

"class of jobs." Merely because the appellant was deemed unfit for the position of firefighter does not, as a matter of law, establish that the County regarded him as substantially limited in the major life activity of working. We must thus look to see if there is other evidence in the summary judgment record to show that the County regarded the appellant as substantially limited in a "broad range of jobs in various classes" or a "class of jobs" and thus regarded him as disabled in the major life activity of working.

As recounted above, the facts generated on summary judgment showed that, on April 6, 2002, Dr. Von Feldt placed the appellant on no duty status after performing the appellant's annual fitness for duty examination and discovering the appellant's diagnosis and treatment for narcolepsy and cataplexy. Over the next five weeks, Dr. Von Feldt collected a summary report from Dr. Raphaelson about the appellant's treatment (wherein Dr. Raphaelson recommended no work restrictions but suggested the County perform other tests); conducted a follow-up examination of the appellant; reviewed the appellant's symptoms against the NFPA Standard; and concluded that the appellant's condition was a "Category B Medical Condition," analogous to a seizure disorder. Based on this information, and following another medical examination of the appellant, on May 14, 2002, Dr. Von Feldt recommended that the appellant be moved from no duty to light duty status, where he would be restricted from working at heights and from operating county vehicles.

The appellant remained on light duty status and, on October 30, 2002, Chief Strock wrote to him saying that in light of OMS's recommendation of light duty status and the reasons therefore, the appellant was not medically qualified for the position of Fire/Rescue Captain. The appellant continued working on light duty status until being returned to his position of Fire/Rescue Captain on October 5, 2003, following a medical evaluation by OMS that found him fit for duty.

We first note that, upon administering the appellant's fitness for duty examination in April of 2002 and learning about

the appellant's diagnosis and treatment for narcolepsy and cataplexy, the County was entitled to investigate further the appellant's fitness for duty. *Krocka, supra,* 203 F.3d at 515; *see also Duda v. Bd. of Educ. of Franklin Park Public School Dist.,* 133 F.3d 1054, 1060 (7th Cir.1998).

■ We further note that the appellant's assignment to no duty status (with full pay), pending the investigation into his fitness for duty, as well as his placement on light duty status before being cleared for full duty on October 5, 2003, is not legally sufficient evidence that the County regarded him as substantially limited in his ability to work. *Talk v. Delta Airlines, Inc.,* 165 F.3d 1021, 1023, 1025 (5th Cir.1999) (noting that evidence that airline determined that an employee could not work in the airline's cargo area, due to her leg deformity, but through the airline's "job placement process" was reassigned to a position as a customer service representative was not sufficient to show that the airline regarded her as unqualified for a broad range of jobs); *Colwell, supra,* 158 F.3d at 647 ("[A]ssignment to light duty status does not support the conclusion that an officer is regarded as disabled.").

■ The appellant asserts that there is still other evidence that permits an inference that the County regarded him as being unable to perform a broad range of jobs. He argues that, because he also was passed over when he applied for the job of Station Commander, as only full duty employees can hold such a position, he was precluded from "more than one job" and thus was regarded as disabled. This argument is unpersuasive because the appellant has not put forth any evidence that the job of Station Commander is somehow separate from, or in another class from, the job of firefighter. If, to be a Station Commander, a person also must meet the qualifications for firefighter, then the job of Station Commander assumes that the individual is also qualified for the position of firefighter—which the appellant (at the time he applied) was not. Accordingly, the appellant's not being hired for the position of Station Commander, without any evidence that it was a separate job from that of firefighter, will not support an

inference that he was excluded from a class of jobs or a broad range of jobs in various classes and thus was regarded as disabled by the County.

 The County's October 30, 2002 letter to the appellant, saying that he no longer was medically qualified for the position of Fire/Rescue Captain and that he would be terminated if he did not seek employment in another County job for which he was qualified, is also not, as the appellant argues, evidence that the County regarded him as substantially limited in the major life activity of working. It is merely evidence that the County regarded him as unfit for the job of Fire/Rescue Captain, which, as noted above, is not a broad range of jobs in various classes or a class of jobs as a matter of law.[22]

Finally, the appellant asserts that certain opinions stated by Doctors Robinson and Von Feldt in their depositions suggest that the County regarded him as unable to perform a broad range of jobs in various classes or a class of jobs. The deposition testimony, given in 2004, was not in existence when the County made its determination that the appellant was not medically qualified for the position of Fire/Rescue Captain on October 30, 2002, and hence was not considered in the decision-making process. Nevertheless, we shall address the ap-

---

**22.** The appellant argues that the County's conclusion that job condition made him unfit to work at heights and operate emergency vehicles (first reached in Dr. Von Feldt's May 6, 2002 memorandum to the appellant, repeated in Dr. Robinson's September 2, 2002 letter to the appellant explaining his medical examination rating of "not acceptable" for the position of Fire/Rescue Captain, and reiterated again in Dr. Von Feldt's 2004 deposition) was evidence that he was prohibited from working in a broad range of jobs and was thus regarded as disabled by the County.

This argument must fail for several reasons. First, not being able to work at heights or operate emergency vehicles is not a broad range of jobs in various classes or a class of jobs as a matter of law. Second, the appellant has put forth no evidence that these restrictions would in fact disqualify him from a broad range of County jobs, other than firefighter. Third, as is evidenced by the hypothetical scenarios set forth by Dr. Robinson in his September 23, 2002 letter to the appellant, these restrictions on the appellant were fashioned in the context of the appellant's duties as a Fire/Rescue Captain, not in the context of some other job.

pellant's arguments about the significance of these deposition opinions and explain why there is no merit in any of them.

 First, the appellant argues that, because Dr. Robinson opined that he could not work "directly in fire and rescue," he was thus precluded from a broad range of jobs. However, what Dr. Robinson was explaining at that point in his deposition was that the appellant would be prohibited from being an "able-bodied firefighter," and what that job entails (*i.e.* working "directly in fire and rescue"). Accordingly, this testimony is not evidence that the appellant was prohibited from a broad range of jobs in various classes or a class of jobs.

 Relatedly, the appellant argues that because Dr. Von Feldt opined in his deposition that he would be prohibited from jobs requiring "exceptional alertness," this shows that the County regarded him as prohibited from a broad range of jobs. Yet, the appellant put forth no evidence that "exceptional alertness" is required for a broad range of jobs. *See Bridges, supra,* 92 F.3d at 333 (holding that a hemophiliac job applicant did not put forth any evidence that he was precluded from a broad range of jobs by employer's decision that he could not perform any job in which he was "routinely exposed to extreme trauma"; merely listing the jobs of "law enforcement, military service, EMT, paramedic, construction worker, manufacturing and machinery processing jobs, saw mill employees, quarry workers, and jobs in the iron and steel industry" was not proof that a person in any of these jobs would be routinely exposed to extreme trauma).

The appellant also argues that Dr. Von Feldt's statement in his deposition that jobs requiring "exceptional alertness" include those such as "police or pilot ... of an airplane," in addition to the job of firefighter, was evidence suggesting that the appellant was unfit for a broad range of jobs. Dr. Von Feldt merely was explaining by illustration the types of jobs he thought might require "exceptional alertness." *See Deas, supra,* 152 F.3d at 481–82.

In *Deas, supra,* the court considered whether certain deposition testimony of the medical doctor who had discharged an

employee due to the employee's seizures was evidence that the doctor regarded the employee as unfit for a "broad range of jobs in various classes." *Id.* at 481. The doctor had opined that the requirements for working in the substance abuse clinic—the position the employee was found unfit for—included "uninterrupted awareness or vigilance" and that this requirement was probably similar to the requirements placed on an airplane pilot. *Id.* The doctor further opined that "if a person w[ere] an airplane pilot, seizures are not acceptable." *Id.* The court found that this testimony was not, as the employee had argued, evidence that the discharging doctor regarded her as being unable to work safely in a "broad range of jobs in various classes"; rather, it was only evidence that the doctor regarded the employee as prohibited from "a few, highly specialized jobs that required relatively high levels of vigilance or uninterrupted awareness." *Id.* at 482. Accordingly, for the same reasons, Dr. Von Feldt's testimony is not evidence that the County regarded the appellant as being unfit for a broad range of jobs in various classes.

### (c)

In sum, because the appellant failed to satisfy his burden of producing evidence on the summary judgment record from which a trier of fact reasonably could infer that the County regarded his narcolepsy and cataplexy as substantially limiting any of his asserted major life activities, he cannot satisfy the first prong of the *prima facie* case for disability discrimination—that he was regarded by the County as having a disability. The circuit court properly granted summary judgment to the County on that basis.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**