*Peninsula Regional Medical Center v. Tracey L. Adkins*, No. 68, September Term, 2015, Opinion by Adkins, J.

**EMPLOYMENT LAW — MARYLAND FAIR EMPLOYMENT PRACTICES ACT — FAILURE TO ACCOMMODATE — REASSIGNMENT OR TRANSFER — DISABILITY DISCRIMINATION:** The definition of "qualified individual with a disability" in § 14.03.02.02(B) of the Code of Maryland Regulations includes employees who could perform the essential functions of a reassignment position, with or without a reasonable accommodation, even if they cannot perform the essential functions of their current position. Summary judgment on former hospital employee's failure to accommodate claim was thus inappropriate because genuine dispute of material fact existed with respect to whether former employee was qualified to perform the essential functions of reassignment position. Summary judgment was also inappropriate on former employee's intentional disability discrimination claim.

Circuit Court for Wicomico County
Case No.: 22-C-13-000191
Argued: March 8, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 68

September Term, 2015

PENINSULA REGIONAL MEDICAL CENTER

v.

TRACEY L. ADKINS

Barbera, C.J.
*Battaglia
Greene
Adkins
McDonald
Watts
Harrell, Glenn T., Jr. (Retired,
    Specially Assigned),

JJ.

Opinion by Adkins, J.

Filed: May 26, 2016

* Battaglia, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

Since its enactment in 1965, the Maryland Fair Employment Practices Act ("FEPA"), Maryland Code (1984, 2014 Repl. Vol.), State Government Article ("SG") § 20-601 *et seq.*, has been an important statutory protection of employee civil rights. FEPA prohibits discrimination in employment on the basis of an "individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, or disability." SG § 20-606. In this case, we address FEPA's grant of protection to disabled individuals. Specifically, we primarily consider an employer's duty to reasonably accommodate a qualified individual with a disability.

## FACTS AND LEGAL PROCEEDINGS

Tracey L. Adkins[1] ("Adkins") began her career at Peninsula Regional Medical Center ("PRMC"), a hospital located in Salisbury, Maryland, around March 2005. She was first employed as a storekeeper in the Materials Management Department, which is, in part, responsible for inventorying and stocking medical supplies and equipment. In this role, Adkins delivered supplies to various floors of the hospital, organized supplies in the supply room, and checked expiration dates of materials. Six months later, she was transferred to Inventory Control, more commonly known as the "Cath Lab," as an inventory control assistant. This position was also in the Materials Management Department. Adkins held this position until September 2010, when the position was "cut." She then transferred back

---

[1] The Respondent is no relation to the author of this opinion.

to the storekeeper position, which she held until her termination on February 25, 2012—the event generating the underlying lawsuit.[2]

In April 2011, Adkins went to PRMC's emergency room after experiencing pain in her groin area and took a few days off from work. When Adkins returned to work, she continued to experience pain but managed to complete her tasks. Adkins was ultimately diagnosed with a tear in the joint of her left hip as well as a deformation in her hip socket. She was scheduled to have surgery in August 2011 and notified her supervisors. She also filled out paperwork to obtain leave under the Family and Medical Leave Act ("FMLA").[3] The FMLA paperwork indicated that her leave would begin on August 25, 2011 and that she would return to work on or about October 6, 2011. In a letter dated August 11, 2011, PRMC approved Adkins's FMLA leave request. In this letter PRMC explained that her 12-week leave under the FMLA would expire on November 17, 2011 and that so long as she returned by that date, she would be returned to her job or an equivalent one. PRMC also advised Adkins in this letter that she would have to obtain a work evaluation from the Employee Health Office before resuming work. Adkins continued working full-time until she underwent surgery in August 2011. In the months leading up to her surgery, Adkins

---

[2] The storekeeper position was renamed Supply Chain Operations Assistant in 2011, but the duties remained essentially the same.

[3] The Family and Medical Leave Act ("FMLA") is a federal law guaranteeing eligible employees 12 weeks of unpaid leave each year. 29 U.S.C. § 2612 (2012). Although the FMLA creates a private right of action against employers who "interfere with, restrain, or deny" the exercise of rights provided in the statute, *Id.* §§ 2615, 2617, Adkins does not allege that Peninsula Regional Medical Center ("PRMC") violated the FMLA.

began applying for other positions at PRMC, including Patient Services Rep – Medical Group.[4]

Following the surgery, Adkins's pain intensified and her doctors advised her that the time for recovery could range from six months to a year. On October 3, 2011, while still out on FMLA leave, Adkins met with James Bunk ("Bunk"), a supervisor who was the supply chain operations manager of the Materials Management Department. She informed him that she was meeting her surgeon on October 10 for a follow-up appointment and that she hoped to learn, at that time, when she could return to work. After the October 10 appointment, Adkins received a letter from her physician advising her that she would be unable to return to work until November 7, 2011. Adkins then delivered this documentation to Bunk and PRMC's Employee Health Office.

On November 7, 2011, Adkins returned to work as scheduled and met with a nurse in the Employee Health Office. She told the nurse that she was still in pain and would be unable to fulfill her job responsibilities on that day. She explained that she experienced increased pain when bending, lifting, and squatting, and that she would not be able to stand for long periods of time. An "Employee Charting Note" for this date states that "[a]ll parties" agreed that Adkins could not return to work. It also reflects that Adkins had "been educated on FMLA and to start looking at job postings," and that Adkins reported having applied for the "core tech position."

---

[4] Adkins also applied for Aide – Physical Therapy, CNA Trainee, Coder Abstractor II, Coordinator – Emergency Admitting, Parking Attendant, Registrar – Outpatient, Representative – Billing/Collection – Medical Group, Representative – Patient Account, and Service Desk IT-Technician before her surgery.

3

Adkins returned to her doctor on November 10 and received a medical report indicating she could return to work under "light duty." That same day, she brought the form to PRMC's Employee Health Office. The form stated that she was restricted to "[s]edentary [w]ork: [l]ifting 10 pounds maximum and occasionally lifting and/or carrying small articles and occasional walking or standing." The Employee Health Office told Adkins "that her unit can not [*sic*] accommodate her restrictions." After her surgery and before her termination, Adkins applied for several different positions, including Patient Services Rep – Medical Group and Core Technician.[5] She also emailed Scott Phillips, director of the Materials Management Department, and Laura McIntyre, Operations Room Materials Manager, asking to be considered for an inventory control coordinator position, writing:

> I was informed that there is now an open position for Inventory Control [Coordinator] in the Cath Lab. With my prior position in the Cath Lab as the [inventory control] assistant I was wondering if I would be considered for the position. I am still released under Doctors orders under sedentary work but [from] prior knowledge of the job I know that the job is mostly sedentary and I do have the experience and know how for the position[.]

She was not hired for any of these positions.

On or around November 17—the day Adkins's 12-week FMLA leave was set to expire—PRMC granted her an additional 14 weeks of leave until February 2012. PRMC encouraged her to apply to open positions, but did not identify any specific positions.

---

[5] Adkins also applied to the following positions: Clerk – Postal, Monitor Technician, Operating Room Core Technician, CNA – Trainee, Coder Abstractor I, and Representative – Billing/Collection – Medical Group.

During this time, Adkins learned that her storekeeper position had been filled. On January 12, 2012, Adkins went back to her doctor for an appointment and received another medical report form, which maintained the "light duty" work restrictions.[6] Adkins testified in her deposition that she also gave this note to PRMC.

On February 25, 2012, at the end of the 14-week extended leave, Adkins was terminated. Adkins applied to four more positions after her termination, but was not hired for any of these positions.

In February 2013, Adkins filed a three-count complaint against PRMC in the Circuit Court for Wicomico County under FEPA, alleging intentional disability discrimination based on actual disability, intentional disability discrimination based on being regarded as having a disability, and failure to accommodate. PRMC thereafter filed a motion for summary judgment.[7] In May 2014, the Circuit Court issued an order and opinion granting summary judgment in favor of PRMC. Adkins appealed the Circuit Court's ruling as to disability discrimination based on actual disability and failure to accommodate, but did not

---

[6] The form was dated January 12, 2011, but all parties agree that the actual year was 2012. Additionally, the doctor checked both the box stating that Adkins "may return to pre-injury job without restriction" and the box indicating the same sedentary work restriction checked off on the November 10, 2011 medical report form. Adkins understood this note to mean that she was still limited to sedentary work.

[7] PRMC filed its first motion for summary judgment in January 2014, but Adkins filed an amended complaint several days later. In light of Adkins's amended complaint, PRMC filed an amended motion for summary judgment in March 2014, which is the subject of this appeal.

5

challenge the trial court's decision on disability discrimination based on being regarded as having a disability.

The Court of Special Appeals, however, reversed the Circuit Court's grant of summary judgment on Adkins's disability discrimination based on actual disability claim and her reasonable accommodation claim. The intermediate appellate court ruled that the evidence contained in the record reflected genuine disputes of material fact as to these claims. PRMC appealed and we granted its Petition for Writ of Certiorari. PRMC presented two questions for review,[8] which we simplify into the following questions:

> (1)    Does the definition of "qualified individual with a disability" include employees who could perform the essential functions of a reassignment position, with or without a reasonable accommodation, even if they cannot perform the essential functions of their current position?

> (2)    Did the Court of Special Appeals err in reversing the Circuit Court's grant of summary judgment in favor of PRMC?

---

[8] In its Petition for Writ of Certiorari, PRMC presented the following questions:

> (1) Is an employee required under Maryland's Fair Employment Practices Act to show that she is a "qualified individual with a disability," namely that she can perform the essential functions of a relevant job with or without a reasonable accommodation, before an employer has a duty to provide a reasonable accommodation?

> (2) May a plaintiff prevail on a disability discrimination or failure to accommodate claim where that employee failed to engage in the interactive process with the employer?

6

Because we answer yes as to question one and no as to question two, we shall affirm the judgment of the Court of Special Appeals and remand for further proceedings. Additional facts shall be included as necessitated by our discussion of the issues.

## STANDARD OF REVIEW

A circuit court may grant a motion for summary judgment if there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Maryland Rule 2-501(f). "The court is to consider the record in the light most favorable to the non-moving party and consider any reasonable inferences that may be drawn from the undisputed facts against the moving party." *Mathews v. Cassidy Turley Md., Inc.*, 435 Md. 584, 598 (2013). When a circuit court's grant of summary judgment hinges on a question of law, not a dispute of fact, we review whether the circuit court was legally correct without according deference to that court's legal conclusions. *Id.*

## DISCUSSION

There are relatively few appellate decisions interpreting Maryland's FEPA. On the other hand, the federal courts have provided "substantial guidance" on the interpretation and application of federal disability legislation. Barbara T. Lindemann et al., Employment Discrimination Law 13-7 (5th ed. 2012). Because FEPA is modeled after federal law, *see Haas v. Lockheed Martin Corp.*, 396 Md. 469, 503–04 (2007) (Battaglia, J., dissenting), a brief overview of federal disability law is necessary.

The intermediate appellate court's outline of federal law is instructive and merits quoting at length. The court wrote:

7

Title VII of the Civil Rights Act of 1964 established a broad prohibition of workplace discrimination on the grounds of race, color, religion, sex, and national origin. Pub. L. No. 88–352, 78 Stat. 253 (1964) (codified as amended at 42 U.S.C. §§ 2000e *et seq.*). Although Title VII did not encompass disability within its scope, Congress thereafter extended Title VII's ban of discriminatory workplace practices to include disability with its enactment of the Rehabilitation Act of 1973. Pub. L. No. 93–112, 87 Stat. 355 (1973) (codified as amended at 29 U.S.C. § 790 *et seq.*). This Act protects federal executive branch employees, *see* 29 U.S.C. § 791, and employees of federal contractors and subcontractors with contracts exceeding $10,000, *see* 29 U.S.C. § 793. It also prohibits discrimination in programs or activities that receive federal financial assistance or are conducted by an executive federal agency or the U.S. Postal Service. *See* 29 U.S.C. § 794.

*Adkins v. Peninsula Reg'l Med. Ctr.*, 224 Md. App. 115, 130–31 (2015).

The Rehabilitation Act of 1973, Pub. L. No. 93–112, 87 Stat. 355 (1973) (codified as amended at 29 U.S.C. § 701 *et seq.* (2012)), was the first federal law to afford protections in the workplace to disabled individuals. Congress enacted the Rehabilitation Act to "promote and expand employment opportunities in the public and private sectors for handicapped individuals and to place such individuals in employment." Rehabilitation Act, § 2(8). The Rehabilitation Act, however, covered only private sector entities that possessed a certain nexus with the federal government, such as federal contractors. *Id.* §§ 503, 504. In 1990, Congress passed the Americans with Disabilities Act ("ADA"), which significantly expanded the applicability of workplace protections to more employers than were covered by the Rehabilitation Act. Pub. L. No. 101-336, 104 Stat. 327 (codified as amended at § 42 U.S.C. § 12112(a) *et seq.*). Under the ADA, employers that employ 15 or more individuals over a 20-week period are covered entities. 42 U.S.C. § 12111(2).

Around the time Congress passed the Rehabilitation Act, the General Assembly amended FEPA's ban on discrimination to include "physically or mentally handicapped persons." Act of July 1, 1974, ch. 601, § 19 (a)(1), 1974 Md. Laws 2029, 2030.[9] Under FEPA, it is unlawful for a covered employer[10] to "fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment" based on his or her "disability [that is] unrelated in nature and extent so as to reasonably preclude the performance of the employment." SG § 20-606(a)(1). The Maryland Commission on Human Relations[11] promulgated regulations expounding on this proscription in the Code of Maryland Regulations ("COMAR") by delineating various forms of unlawful employment discrimination against "a qualified individual with a disability," including "[h]iring, upgrading, promotion, tenure, demotion, transfer, layoff, termination, right of return from layoff, and rehiring." COMAR § 14.03.02.04(A)(2).

---

[9] In 1999, the General Assembly replaced the term "handicap" with "disability," without substantive change in the definition. Act of Oct. 1, 1999, ch. 60, § 20(k), 1999 Md. Laws 1003, 1007. In 1992, Congress similarly amended the Rehabilitation Act by changing the term "handicap" to "disability" and the phrase "individuals with handicaps" to "individuals with a disability" throughout the Act. Rehabilitation Act Amendments of 1992, Pub. L. No. 102-569, § 2(p)(29)(A), 31(B), and (32), 106 Stat. 4344 (1992).

[10] The Maryland Fair Employment Practices Act ("FEPA"), Maryland Code (1984, 2014 Repl. Vol.), State Government Article ("SG") § 20-601(d), like the ADA, defines an employer as a person "engaged in an industry or business" and "has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year." It is undisputed that PRMC is a covered employer under FEPA.

[11] The Maryland Commission on Human Relations was renamed the Maryland Commission on Civil Rights in 2011.

9

FEPA also prohibits an employer from failing or refusing "to make a reasonable accommodation for the known disability of an otherwise **qualified** employee." SG § 20-606(a)(4) (emphasis added). COMAR provides:

> A covered entity (1) [s]hall make a reasonable accommodation to the known physical or mental limitations of **a qualified individual with a disability**; (2) [i]s not required to provide an accommodation, if it demonstrates that the accommodation would impose undue hardship on the operation of its business or program; and (3) [m]ay not deny an employment opportunity to a qualified individual with a disability, if the basis for the denial is the need to accommodate the individual's physical or mental limitations, and this accommodation, if attempted, would be reasonable.

COMAR § 14.03.02.05(A) (emphasis added). Thus, employers are required to accommodate only "qualified" individuals with a disability under FEPA. *Cf.* 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a *qualified* individual on the basis of disability[.]") (emphasis added). A "qualified individual with a disability" is "an individual with a disability who: (a) [w]ith or without reasonable accommodation can perform the essential functions of the job in question; or (b) [i]s otherwise qualified for the benefit, term, condition, or privilege of employment at issue." COMAR § 14.03.02.02(B)(10).

The term "qualified individual with a disability" also appears in COMAR § 14.03.02.04(B)(3). This regulation provides that it is an unlawful employment practice for a covered entity to "[f]ail to make an individualized assessment of a qualified individual with a disability's ability to perform the essential functions of a job." COMAR § 14.03.02.04(B)(3). Federal regulatory disability discrimination law does not use the

10

phrase "individualized assessment," but requires an employer "initiate an informal, **interactive process** with the individual with a disability in need of the accommodation" to identify a reasonable accommodation. 29 C.F.R. § 1630.2(o)(3) (emphasis added); *see E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 778 (6th Cir. 2015) ("We, along with many other circuits, have held that the employer's duty to participate in the interactive process in good faith is mandatory") (citation omitted); *Fleetwood v. Harford Sys. Inc.*, 380 F. Supp. 2d 688, 701 (D. Md. 2005) ("[I]f it is not immediately obvious what accommodation would be appropriate, the ADA requires that the employer and employee engage in an interactive process to identify a reasonable accommodation.") (citing *Bryant v. Better Bus. Bureau of Greater Md.*, 923 F. Supp. 720, 737 (D. Md. 1996) and 29 C.F.R. § 1630.2(o)(3)). We agree with the intermediate appellate court and the parties that COMAR § 14.03.02.04(B)(3) requires action akin to an interactive process to identify a reasonable accommodation.

In this case, it is undisputed that Adkins was unable to perform the essential functions of the storekeeper position. The principal issue here rather is whether the intermediate appellate court was correct in holding that one who cannot perform the essential functions of his or her *current* job can still be considered a "qualified individual with a disability" entitled to a reasonable accommodation. Another key dispute is the concomitant issue of whether an employer has an obligation to conduct an individualized assessment of an employee who cannot perform the essential functions of his or her position. Because PRMC's appeal challenges the heart of Adkins's failure to accommodate

11

claim under SG § 20-606(a)(4), we shall address that first, before examining her intentional

disability discrimination claim under SG § 20-606(a)(1).

**Failure to Accommodate**

Although the statutory duty to accommodate rests on the employer, the burden of

proving that an employer could not have reasonably accommodated a disabled employee

does not arise until the employee presents his or her prima facie case. *Gaither v. Anne*

*Arundel Cnty.*, 94 Md. App. 569, 583 (1993). To establish a prima facie case for a failure

to accommodate claim, an employee must show: (1) that he or she was an individual with

a disability; (2) that the employer had notice of his or her disability; (3) that with reasonable

accommodation, he or she could perform the essential functions of the position (in other

words, that he or she was a "qualified individual with a disability"); and (4) that the

employer failed to make such accommodations. *See id*; *Jacobs v. N.C. Admin. Office of*

*the Courts*, 780 F.3d 562, 579 (4th Cir. 2015) (setting forth the elements an employee must

establish as part of his or her prima facie case for failure to accommodate under the

Americans with Disabilities Act). A failure to accommodate claim does not, however,

require any showing of discriminatory intent. *See Lenker v. Methodist Hosp.*, 210 F.3d

792, 799 (7th Cir. 2000) ("[I]f the plaintiff demonstrated that the employer should have

reasonably accommodated the plaintiff's disability and did not, the employer has

discriminated under the ADA and is liable."); *Scalera v. Electrograph Sys., Inc.*, 848 F.

Supp. 2d 352, 362 (E.D.N.Y. 2012) ("[T]here is no burden on Plaintiff to show that her

disability played any motivating role in Electrograph's failure to provide the requested accommodation.").

PRMC does not contest the Circuit Court's conclusion that Adkins's hip injury constitutes a disability within the meaning of FEPA. Accordingly, we begin our analysis as to whether summary judgement was appropriate on Adkins's failure to accommodate claim at the second element required as part of an employee's prima facie case.

**Notice of Disability and Request for Accommodation**

To receive an accommodation, an employee must "communicate[] to his employer his disability and his desire for an accommodation for that disability." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 346–47 (4th Cir. 2013). This requirement exists because an employer "cannot be expected to accommodate disabilities of which it is unaware." *Pollard v. Balt. Cnty. Bd. of Educ.*, 65 F. Supp. 3d 449, 456 (D. Md. 2014). The burden on an employee to provide notice of a disability is "'not a great one.'" *Rock v. McHugh*, 819 F. Supp. 2d 456, 473 (D. Md. 2011) (quoting *E.E.O.C. v. Fed. Express Corp.*, 513 F.3d 360, 369 n.5 (4th Cir. 2008)). Indeed, adequate notice does not require the use of the phrase "reasonable accommodation," explicit reference to a statute, or the invocation of magic words. *See Pollard*, 65 F. Supp. 3d at 456.[12] Additionally, a request for an accommodation need not be in writing. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999). The key consideration in determining whether an employee has satisfied the second

---

[12] *See also* EEOC, Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans With Disabilities Act No. 915.002 (Oct. 17, 2002) ("To request accommodation, an individual may use 'plain English' . . . ."), *available at* http://www.eeoc.gov/policy/docs/accommodation.html.

element of his or her prima facie case is whether the employee "provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." *Id.* (according little weight to "formalisms about the manner of the request").

Here, while out on FMLA leave and after her surgery, Adkins met with her supervisor, James Bunk, and updated him about a follow-up appointment with her doctor. After this follow-up appointment, Adkins received a note from her surgeon stating that she would be unable to return to work until November 7, 2011 and delivered this documentation to Bunk and the Employee Health Office. After returning from her FMLA leave on November 7, Adkins met with a nurse in the Employee Health Office. The nurse quoted Adkins as saying, "I am in pain and I feel I have restrictions" and "What am I supposed to do[?] I have to work." Adkins also advised the nurse that she was no longer able to perform the essential duties of her storekeeper position because of her hip injury. The nurse documented: "Tracey reports 'I can't walk all day long or for long periods of time, I can't do repeated stuff.' She reports increased pain with bending/lifting/squatting. Tracey reports that her job requires her to walk in the store room and also walk around the hospital." Adkins's informing Bunk and the nurse in the Employee Health Office of her hip surgery and physical limitations following that surgery certainly establishes a triable issue of fact as to whether PRMC had notice of Adkins's disability.

Additionally, a reasonable jury could conclude that Adkins communicated to PRMC a "desire for an accommodation," *Wilson*, 717 F.3d at 346–47, based on her submission of

14

a medical report from her physician to the Employee Health Office.[13]  This report indicated that she could return to work under "light duty," and could perform "[s]edentary [w]ork: [l]ifting 10 pounds maximum and occasionally lifting and/or carrying small articles and occasional walking or standing."  The submission of this medical report, along with her telling the Employee Health Office "[w]hat am I supposed to do[,] I have to work," could lead a reasonable jury to find that PRMC had notice of Adkins's need for an accommodation because of her hip injury.  *Cf. Miller v. Ill. Dep't of Corr.*, 107 F.3d 483, 486–87 (7th Cir. 1997) ("Even if an employee who . . . becomes disabled while employed just says to the employer, 'I want to keep working for you-do you have any suggestions?' the employer has a duty under the [ADA] to ascertain whether he has some job that the employee might be able to fill.") (citations omitted).

Moreover, the record contains an "Employee Charting Note" in which a nurse in the Employee Health Office documented her receipt of the medical report and wrote that Adkins was "made aware that her unit can not [*sic*] **accommodate** her restrictions." (Emphasis added.)  This language gives rise to a reasonable inference that PRMC knew of Adkins's need for an accommodation and that it believed Adkins delivered the medical report in an attempt to explain what accommodation she needed.  Adkins asking to be considered for the vacant inventory control coordinator position in a January 2012 email to one of her supervisors is also evidence in the record supporting that PRMC had notice

---

[13] Adkins brought the medical report to the Employee Health Office on the same day she received it from her doctor.  Adkins's delivering the medical report a mere three days after her November 7 meeting further evidences her desire to return to work despite her physical limitations.

15

of her need for an accommodation. In this email, Adkins linked her interest in the position with her light-duty restriction, noting that she was "still released under Doctors [*sic*] orders under sedentary work." Viewing the record in the light most favorable to Adkins, there is a genuine dispute of material fact as to whether she provided PRMC "with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." *Taylor*, 184 F.3d at 313. Accordingly, we reject PRMC's contention that summary judgment was appropriate because Adkins never requested an accommodation.[14]

### Qualified Individual with a Disability and the Individualized Assessment

The "qualified individual with a disability" element of an employee's prima facie case is the core issue in this case. The parties do not dispute that an employee, in order to establish that an employer failed to provide a reasonable accommodation in violation of SG § 20-606(a)(4), must show that he or she is a "qualified individual with a disability" as part of his or her prima facie case. Nonetheless, PRMC devotes a substantial portion of its brief arguing this well-settled area of law. This stems partly from PRMC's erroneous understanding of what it means to be a "qualified individual with a disability."

COMAR § 14.03.02.02(B)(10) defines a "qualified individual with a disability" as an individual with a disability who "[w]ith or without reasonable accommodation can perform the essential functions of the job in question." PRMC suggests that we read this

---

[14] Adkins's January 2012 email asking to be considered for the vacant inventory control coordinator position also belies PRMC's assertion that reassignment was "conjured post-employment by her attorney."

16

definition narrowly and misunderstands the term "job in question" to mean the disabled employee's current position. PRMC quotes the following passage from *Myers v. Hose*, 50 F.3d 278, 284 (4th Cir. 1995) as support for this contention: "[T]he duty of reasonable accommodation does not encompass a responsibility to provide a disabled employee with alternative employment when the employee is unable to meet the demands of his present position." PRMC proclaims that the "Court of Special Appeals ignore[d] this critical requirement."

The Court of Special Appeals was correct to "ignore" this statement from the Fourth Circuit because it is a mistaken interpretation of the law. *See Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 633 (6th Cir. 1999) ("*Myers* has not been well-received by other circuits"). The U.S. Court of Appeals for the Sixth Circuit explained the flawed reasoning of the Fourth Circuit:

> The infirmity of *Myers* was that it relied on case law interpreting the Rehabilitation Act before the statute was amended in 1992. *See Myers*, 50 F.3d at 284 (citing *Guillot v. Garrett*, 970 F.2d 1320, 1326 (4th Cir. 1992)). Prior to 1992, the Rehabilitation Act did not include re-assignment to a vacant position as a reasonable accommodation. *See Gile v. United Airlines, Inc.*, 95 F.3d 492, 497 (7th Cir. 1996). After the ADA was enacted, Congress amended the Rehabilitation Act to parallel the standards for employment discrimination under the ADA. *Id.*; *see also* 29 U.S.C. § 794(d). Of course, the ADA explicitly lists "reassignment to a vacant position" as a possible reasonable accommodation mandated by the statute. 42 U.S.C. § 12111(9)(B).
>
> Thus, pre–1992 Rehabilitation Act decisions such as *Guillot* holding that re-assignment is not a reasonable accommodation are no longer good law in light of 29 U.S.C. § 794(d), and *Myers* was wrong to suggest otherwise. *See Gile*, 95 F.3d at 498.

*Id.* Nearly every federal circuit court has silently or explicitly rejected *Myers* and concluded that the definition of "qualified individual with a disability" includes employees who could perform the essential functions of a reassignment position, with or without a reasonable accommodation, even if they cannot perform the essential functions of their current position. *See Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1161–62 (10th Cir. 1999) (en banc) (collecting cases); *see also Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1018–19 (8th Cir. 2000) (noting that "*Myers* has been sharply criticized"). Notably, even the Fourth Circuit has disavowed *Myers*. *See Williams v. Channel Master Satellite Sys., Inc.*, 101 F.3d 346, 350 n.4 (4th Cir. 1996) (rejecting district court's suggestion that reassignment to vacant position can never be reasonable accommodation and noting that such a conclusion would be "contrary to congressional direction"); *see also Bratten*, 185 F.3d at 634 ("Additionally, we note the Fourth Circuit itself has since acknowledged its mistake, and professed that the rule set forth in *Myers*, upon which the district court relied, was 'contrary to congressional direction.'") (citation omitted).

PRMC concedes that the ADA and FEPA definitions of "qualified individual with a disability" are "substantially similar." *Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582, 599 (D. Md. 2013) ("As to Maryland law claims alleging violations of State Government Article § 20–601 *et seq.*, this Court has recognized that the definitions of 'qualified individual with a disability' under the ADA and the Code of Maryland Regulations § 14.03.02.02(B)(10) are 'nearly identical.'") (citations omitted); *compare*

42 U.S.C. § 12111(8) ("The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."), *with* COMAR § 14.03.02.02(B)(10) (defining a "qualified individual with a disability" as an individual with a disability who "[w]ith or without reasonable accommodation can perform the essential functions of the job in question"). Like the ADA, Maryland law explicitly lists reassignment to a vacant position as a reasonable accommodation. COMAR § 14.03.02.05(B)(5) ("[r]eassigning or transferring an employee to a vacant position"). Although we cannot use case law construing federal statutes as a "surrogate for analysis" of the meaning of Maryland law, we can look to federal decisions interpreting ADA provisions for guidance in construing similar clauses in FEPA. *Haas*, 396 Md. at 492; *Meade v. Shangri-La P'ship*, 424 Md. 476, 489 (2012); *see Ridgely v. Montgomery Cnty.*, 164 Md. App. 214, 232 (2005) (using decisions interpreting the ADA to interpret provisions of Montgomery County's discrimination law). We do so now as we examine PRMC's arguments in light of the numerous federal decisions rejecting *Myers*.

PRMC criticizes the intermediate appellate court's decision in this case for permitting Adkins to use reassignment as "a means to establish [that] she is a qualified individual with a disability" and relies on *Gaither*, 94 Md. App. at 584, as saying that a plaintiff's "contention that he could have been reassigned to another position was nothing more than an effort to confuse the employer's duty to accommodate with the employee's burden of proving that he could perform the essential duties of the job." *Gaither,* however, was a 1993 case decided before COMAR was amended in 2001 to expressly allow

19

reassignment and transfer to a vacant position. 28 Md. Reg. 25, 2192, 2192–93 (Dec. 24, 2001). Moreover, the court in *Gaither*, like the Fourth Circuit in *Myers*, cited a pre-1992 Rehabilitation Act decision for this proposition. *Gaither*, 94 Md. App. at 584 (citing *Jasany v. U.S. Postal Serv.*, 755 F.2d 1244, 1251 (6th Cir. 1985)).

The "qualified individual with a disability" language also appears in COMAR 14.03.02.04(B)(3). Hence, PRMC's misperception of this term colors its reading of an employer's obligation to conduct an individualized assessment to identify a reasonable accommodation under COMAR § 14.03.02.04(B)(3). PRMC argues that an employer must conduct an individualized assessment only of employees who can perform the essential functions of their currently held position. We reject this overly bridled view of an individualized assessment because it fails to recognize that the very purpose of the individualized assessment is to identify an effective reasonable accommodation. *See Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1116 (9th Cir. 2000) (en banc), *overruled on other grounds*, 535 U.S. 391 (2002) ("The interactive process is the key mechanism for facilitating the integration of disabled employees into the workplace. . . .Without the interactive process, many employees will be unable to identify effective reasonable accommodations."); *Sansone v. Donahoe*, 98 F. Supp. 3d 946, 954 (N.D. Ill. 2015) ("[T]he entire purpose of the interactive process is for the employer to determine an appropriate accommodation[.]"). As the Court of Special Appeals aptly noted, COMAR § 14.03.02.04(B)(3) makes it an unlawful employment practice for a covered employer to fail to conduct an individualized assessment of an employee's ability to perform the essential functions of "*a* job, not simply the job that the employee held." *Adkins*, 224 Md.

App. at 145 (emphasis in original). Requiring an individualized assessment of only those employees who can perform the essential functions of their currently held position is also inconsistent with COMAR § 14.03.02.05(B)(5), which expressly stipulates that reassignment or transfer to a vacant position is a reasonable accommodation.[15] We therefore reject PRMC's argument that COMAR § 14.03.02.04(B)(3) requires an individualized assessment of only those employees who can perform the essential functions of their currently held position.

Adkins maintains that PRMC did not conduct an individualized assessment. In her deposition, Adkins testified that PRMC advised that she should apply for vacant positions, but did not help her in identifying any specific position.[16] Additionally, Adkins attested in her affidavit that she recalled speaking to a PRMC recruiter about the Core Tech position, but did "not recall [the recruiter] bringing up any other jobs" that she could do. PRMC argues that Adkins failed to assist it in conducting an individualized assessment and "is

---

[15] At oral argument, PRMC contradicted itself. It acknowledged that an employee does not have to establish that he or she is a qualified individual with a disability to kick off the interactive process. Notwithstanding this concession, PRMC proclaimed that the individualized assessment should not be triggered until the employee has established, "legally," that he or she is a qualified individual with a disability, which one "may not always know until after the fact." We refuse to adopt this circular reasoning because it contravenes the plain language of COMAR.

[16] PRMC counters that Adkins could access all vacant positions on its website. PRMC's encouraging Adkins to apply for other positions via its website, however, does not satisfy its responsibility to conduct an individualized assessment to formulate an effective accommodation. *See Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 694–95 (7th Cir. 1998) (finding employer's policy of posting job openings and insisting that disabled employees independently learn of and apply for new positions insufficient to satisfy the employer's duty under the ADA to investigate the possibility of transferring disabled employees).

21

solely responsible for the breakdown in communication." Adkins spoke with a PRMC recruiter about her application for the OR Core Tech position in November 2011, but PRMC highlights that Adkins did not return the recruiter's second call to discuss what positions she might be able to perform. PRMC also points out that Adkins, after sending an email to Scott Phillips, director of the Materials Management Department, asking whether she could be considered for an inventory control coordinator position, failed to respond to his reply email querying when she would "have a full release without restrictions." Review of the exact terms of that correspondence reveals the fallacy in PRMC's argument:

> Adkins: Hi Scott, I was informed that there is now an open position for Inventory Control [Coordinator] in the Cath Lab. With my prior position in the Cath Lab as the [inventory control] assistant I was wondering if I would be considered for the position. I am still released under Doctors orders under sedentary work but [from] prior knowledge of the job I know that the job is mostly sedentary and I do have the experience and know how for the position[.]
> Phillips: Hi Tracey, I spoke to Mitzi [Sara Scott, former director of human resources at PRMC] about your interest in the [Inventory Control Coordinator] position and we would need to have a full release from your doctor before you would be able to apply for a position. **Do you have an idea as to when you will have a full release without restrictions**?

(Emphasis added.)

Adkins testified in her deposition that she did not respond to Phillips's email inquiring about when she would have a "full release without restrictions" because she did not know the answer. Based on Phillips's email, a jury could reasonably find that PRMC required Adkins to be fully healed before it would consider her for the Inventory Control

22

Coordinator position, a mandate fully at odds with the requirements of Maryland law to perform an individualized assessment to determine whether she could perform the essential functions of the position with or without reasonable accommodation. COMAR § 14.03.02.04(B)(3). Indeed, in his deposition, Phillips claimed that Adkins would not be able to satisfy the physical requirements of lifting and walking for the inventory control position, but disclosed that he did not consider whether the position could be modified to accommodate her. Likewise, Bunk testified that there were no sedentary positions in the Central Stores Department and, therefore, he did not consider whether Adkins could be accommodated. Accordingly, the Court of Special Appeals appropriately recognized that it was "unclear" whether any of Adkins's supervisors made an assessment of her capabilities, and that this was a jury issue.

As PRMC asserts in its brief, the hospital "never concluded that Ms. Adkins was disabled." When asked at his deposition whether he ever considered that Adkins had a disability which required an accommodation, Bunk replied that he "never considered she had a disability." Similarly, Phillips testified that because Adkins's surgery "was a personal choice" instead of a work-related injury, "[he] didn't take into consideration any legal requirements to consider her with a disability." Yet Adkins undisputedly communicated her physical limitations to PRMC, along with her physician's instructions, and PRMC does not now contest that she was, indeed, disabled. Based on these circumstances, a jury could conclude that PRMC never conducted an individualized assessment. *See Cravens*, 214 F.3d at 1021 (when an employer fails to participate in the interactive process, it may be found to be evidence of bad faith and render an award of

23

summary judgment to the employer inappropriate); *Taylor*, 184 F.3d at 318 ("[W]here there is a genuine dispute about whether the employer acted in good faith, summary judgment will typically be precluded."); *Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 695–96 (7th Cir. 1998) (refusing to grant summary judgment to an employer because it may not have participated in good faith in finding accommodation).

## Identification of a Reasonable Accommodation

An employer's failure to engage in the interactive process to formulate an effective accommodation is not a per se violation of the ADA. *Sparrow v. D.C. Office of Human Rights*, 74 A.3d 698, 705 (D.C. Cir. 2013); *Cravens*, 214 F.3d at 1021; *Taylor*, 184 F.3d at 317–18. An employer's failure to participate in good faith in the interactive process is not actionable unless the employee can demonstrate that he or she could have been reasonably accommodated. *Jacobs*, 780 F.3d at 581 ("[A]n employer will not be liable for failure to engage in the interactive process if the employee ultimately fails to demonstrate the existence of a reasonable accommodation that would allow her to perform the essential functions of the position.") (citing *Wilson*, 717 F.3d at 347); *see McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 100 (2d Cir. 2009) ("[E]ach of our sister Circuits to have considered the issue has concluded that failure to engage in an interactive process does not form the basis of an ADA claim in the absence of evidence that accommodation was possible."); *see also Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 233–34 (3d Cir. 2000) (Alito, J.) ("[I]n a failure-to-transfer case [under the Rehabilitation Act], if, after a full opportunity for discovery, the summary judgment record is insufficient to establish the existence of an appropriate position into which the plaintiff could have been transferred,

24

summary judgment must be granted in favor of the defendant-even if it also appears that the defendant failed to engage in good faith in the interactive process.").[17]

So we look to see whether there is evidence that Adkins could have been reasonably accommodated. Adkins identifies reassignment to a vacant position under COMAR § 14.03.02.05(B)(5) as a possible reasonable accommodation. She states that she identified and in fact applied for three vacant positions for which she could perform the essential functions of the position with or without a reasonable accommodation: (1) Core Technician; (2) Inventory Control Coordinator; and (3) Patient Service Rep – Medical Group. In determining whether Adkins could have been reasonably accommodated, we must first determine the essential functions of the position sought, and then whether Adkins could perform the essential functions with or without a reasonable accommodation.

**Essential Functions**

Generally, the determination of whether a given function is essential is a factual question for the jury and thus not suitable for resolution by summary judgment. *See Hall v. U.S. Postal Serv.*, 857 F.2d 1073, 1078–79 (6th Cir. 1988); *see also Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 283 (3d Cir. 2001) (remanding for trial after summary judgment for employer because motions court incorrectly decided that reasonable jurors could only find that working at heights is an essential element of the cable television

---

[17] As one treatise put it: "An employer will not be held independently liable under the ADA for failing to engage in an interactive process to determine reasonable accommodations. Rather, liability stems from the refusal to grant a reasonable accommodation occasioned by the refusal to engage in the process." Peter A. Susser & Peter J. Petesch, Disability Discrimination and the Workplace 1063 (2d ed. 2011) (footnote omitted).

installer technician position); *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 849 (6th Cir. 1998) (recognizing general rule but treating as legal question because Ohio statute set out qualifications for position that were not met by applicant).

In *Hall*, the U.S. Court of Appeals for the Sixth Circuit fleshed out the factual nature of the inquiry while reversing a summary judgment for the defendants:

> While legitimate physical qualifications may be essential to the performance of certain jobs, both that determination and the determination of whether accommodation is possible are *fact-specific* issues. The court is obligated to scrutinize the evidence before determining whether the defendant's justifications reflect a well-informed judgment grounded in a careful and open-minded weighing of the risks and alternatives, or whether they are simply conclusory statements that are being used to justify reflexive reactions grounded in ignorance or capitulation to public prejudice.

857 F.2d at 1078–79 (quoting *Arline v. Sch. Bd. of Nassau Cnty.*, 772 F.2d 759, 764–65 (11th Cir. 1985) (citations omitted and emphasis added), *aff'd*, 480 U.S. 273 (1987)).

In making their determinations courts have, to a degree, deferred to the employers' job description:

> "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). But this deference is not absolute:

> The inquiry into whether a particular function is essential initially focuses on whether the employer *actually requires* employees in the position to perform the functions that the employer asserts are essential. . . .

> Interpretive Guidance on Title I of the Americans With Disabilities Act, 29 C.F.R. pt. 1630, app. § 1630.2(n) (emphasis added). Fact-finders must determine whether a function is "essential" on a case-by-case basis. *Id.*

*E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 697–98 (5th Cir. 2014).

This does not mean that the issue of essential function will *always* be for the factfinder. Ruling that a route assistant to a driver salesman selling and delivering cases of beer was a position for which heavy lifting was an essential function, a federal court considered the following factors from an EEOC regulation:

> (1) whether the reason the position exists is to perform that function; (2) whether there are a limited number of employees available among whom the performance of that job function can be distributed; and/or (3) whether the function is highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

*McCollough v. Atlanta Beverage Co.*, 929 F. Supp. 1489, 1499–1500 (N.D. Ga. 1996) (citing 29 C.F.R. § 1630.2(n)). *See also White v. York Int'l Corp.*, 45 F.3d 357, 362 (10th Cir. 1995) ("As to possible accommodations which would have enabled him to perform the essential lifting and standing functions of the Machine Operator II and Unit Assembler positions, White offered no evidence. Instead, he simply continued to assert the bald conclusion that with 'reasonable accommodation' he could have performed the 'essential functions' of the jobs at issue."); *Haysman v. Food Lion, Inc.*, 893 F. Supp. 1092, 1102 (S.D. Ga. 1995) ("The undisputed evidence shows that the assistant manager often performs heavy lifting, that he is one of a limited number of employees available amongst whom this function can be distributed, and that if the assistant manager cannot perform this

function when required then the store cannot function properly. . . . [T]he 70 pound lifting requirement is an essential function of the assistant manager position.").

The variety of jobs and individual disabilities have made development of a clear rule delineating the fact versus law spectrum in this context somewhat elusive.[18] So, as indicated previously, we will judge each position individually to determine whether there is a dispute of material fact, as in any summary judgment appeal.[19] In this case, the analysis differs with respect to each of the three positions sought by Adkins.

### Inventory Control Coordinator

We start with the Inventory Control Coordinator position and address whether reassignment to this position would be a reasonable accommodation. The parties disagree over how to define the essential functions of this position and whether Adkins could perform these essential functions with or without a reasonable accommodation.

PRMC's written job description for the Inventory Control Coordinator position provides:

> Responsible for maintaining control of the inventory asset account in the Cardiac Cathorization and Electrophysiology labs. This includes overseeing the daily ordering, receiving, and issuing functions. It also includes completing all adjustments, physical inventories, cycle counts, and par level distributions. Must work closely with finance to maintain

---

[18] *See Pullman-Standard v. Swint*, 456 U.S. 273, 288 (1982) ("The Court has previously noted the vexing nature of the distinction between questions of fact and questions of law . . . [W]e [do not] yet know of any . . . rule or principle that will unerringly distinguish a factual finding from a legal conclusion.").

[19] Adkins had the opportunity to conduct full discovery, including inquiry in relation to the three positions to which she applied, and to defend the motion for summary judgment with access to such discovery material.

integrity between physical and perpetual inventory. Assists where necessary in the ordering of inventory items. Recommends and supports goals and objective[s] that are consistent with the mission statement of Peninsula Regional Medical Center. Delivers exceptional quality and service to all patients and other customers . . . .

The job description further provides that 1/3 of the time is spent sitting and less than 1/3 of the time is spent lifting.

Adkins expressed interest in the inventory control coordinator position when she emailed Phillips and McIntyre in January 2012. She stated:

> I was informed that there is now an open position for Inventory Control [Coordinator] in the Cath Lab. With my prior position in the Cath Lab as the [inventory control] assistant I was wondering if I would be considered for the position. I am still released under Doctors orders under sedentary work but [from] prior knowledge of the job I know that the job is mostly sedentary and I do have the experience and know how for the position[.]

Adkins testified to her familiarity with the position in her deposition, but noted that the physical requirements were "a lot less than when I was up there." Nonetheless, she felt she would be able to do the actual job with an accommodation. In her affidavit, Adkins also explained her familiarity with working in Inventory Control from her experience as an assistant in the "Cath Lab" from about 2005 through 2010:

> [I] am familiar with the work. I heard about the Inventory Control Coordinator position and on January 17, 2012 sent an email to Scott Phillips, Director of Materials Management and Laura McIntyre, OR Materials Manager (Ex. 19, 22) to be considered for the position. I know **I could have performed the work because, having worked there for four years, there is very little heavy lifting. The primary heavy item which needed to be handled by the Inventory Control Coordinator on a regular basis were boxes with Intra**

29

**Venous (IV) fluid bags, weighing more than 20lbs, which had to be received and stored. I could have easily handled these boxes by opening the boxes and taking out the IV bags individually. Each of the bags weighed less than 5 lbs.** There was generally about one hour of walking during the course of a day to the Cath and EP labs to take inventory every day and put the supplies out where they belonged. The supplies that were received were usually brought up by someone else from Central Stores. The position was mentally demanding because of the need to track inventory and computer input required for the position.

(Emphasis added.)

PRMC, however, maintains that the position is physically demanding. PRMC points to deposition testimony from Sherry Pruitt, a former inventory control coordinator. She testified that the position was physically demanding, that she was on her feet often, and that she did a lot of walking. Sarah Scott, former director of human resources at PRMC, testified in her deposition that Adkins could not fulfill the inventory control coordinator position because of the lifting and walking and that she recollected that the position is physical: "It's not sedentary. It's not sitting at a desk." In an affidavit, Scott stated that the position "cannot be performed with the sedentary restrictions that Ms. Adkins had in place" and that "[n]o accommodation could be made permitting Ms. Adkins to perform [the position]." Similarly, Scott Phillips testified in his deposition that Adkins would not be able to satisfy the physical requirements of the position.

Notwithstanding this plethora of evidence from hospital employees about the physical demands of this position, this case is much harder to decide than the beer delivery assistant and grocery store manager cases where physical strength is the *sine qua non* of the job. As the Court of Special Appeals aptly explained:

We have explained that the employee "need not be able to perform all the duties of the job at issue—rather, he must only be able to perform the *essential duties* of the job." There is no doubt that the inventory control coordinator position entails some physical tasks, but neither the job description nor the deposition testimony conclusively establish that the walking and lifting requirements are "essential" to the functionality of the position, such that judgment should be entered as a matter of law instead of submitted to a jury to fulfill its fact-finding endeavor. The job description provides that 1/3 of the time is spent standing and walking, and less than 1/3 of the time is spent lifting—that the position involves standing/lifting does not necessarily mean, on this record, that those duties are essential.

*Adkins*, 224 Md. App. at 157 (citation omitted) (emphasis in original).

Although Phillips stated that the position required one to "walk down to the Central Stores warehouse to pick up their order [of supplies]," Adkins contradicted that in her affidavit—saying that the "supplies that were received were brought up by someone else from Central Stores"—a quintessential dispute of material fact.[20] Also, in her affidavit, Adkins stated that the position involved "very little heavy lifting" and that the "primary heavy item which needed to be handled by the Inventory Control Coordinator on a regular

---

[20] The Court of Special Appeals said: "[W]e know of no reason why an employer should be required to transfer job responsibilities to another employee to satisfy its obligation to reassign under Maryland law." *Adkins v. Peninsula Reg'l Med. Ctr.*, 224 Md. App. 115, 153 (2015). In the context of the paragraph in which this statement appears, it seems clear that the Court was referring to transferring "essential functions of a job." To clarify, an employer might be required to assign some non-essential job responsibilities to another employee to satisfy its obligation to reassign under Maryland law. *Cf. Bratten*, 185 F.3d at 632 (noting that employers may be required to reassign non-essential tasks in order to accommodate an employee's disability).

31

basis were boxes with Intra Venous (IV) fluid bags, weighing more than 20 lbs."[21]  Adkins

explained that she could have been accommodated with this part of the lifting had she been

allowed to open the boxes and take out the IV bags individually because each of the bags

weighed less than five pounds.

Citing *Alexander v. Northland Inn*, 321 F.3d 723, 727 (8th Cir. 2003), PRMC argues

that Adkins's subjective belief that she could have fulfilled the essential functions of the

job is not dispositive, and found the intermediate appellate court's giving credence to

Adkins's belief "baffling and erroneous."  We are not so baffled.  The intermediate

appellate court correctly pointed out that Adkins had first-hand knowledge of the position

from working in Inventory Control for over four years and that the work experience of past

employees in the position is a consideration in determining whether a job function is

essential.  *Adkins*, 224 Md. App. at 157 (citing 29 C.F.R. § 1630.2(n) ("Evidence of

whether a particular function is essential includes . . . [t]he work experience of past

incumbents in the job")).

PRMC would have us ignore Adkins's testimony on this point because her previous

position in Inventory Control was that of inventory control assistant, not inventory control

coordinator.  PRMC's job summary, education requirements, and physical activity

requirements for both positions, however, are identical.  Furthermore, in the "Job

Description/Performance Evaluation" from when Adkins was an inventory control

assistant, the job title is listed as "Inventory Control Coordinator" with the word

---

[21] This is consistent with PRMC's job description for inventory control coordinator, which provides that under 1/3 of the time is spent lifting between 25 and 50 pounds.

"coordinator" crossed out and "Asst." written in its place. We, therefore, reject PRMC's intimation that Adkins was unfamiliar with the duties of inventory control coordinator because she did not work in that actual position.[22]

Finally, PRMC points out that it is undisputed that Adkins simply sent an email asking to be considered for the inventory control coordinator position and never formally applied for the job.[23] We agree with the Court of Special Appeals that for a failure-to-accommodate claim, where the employee provided adequate notice that he or she has a disability and needs an accommodation, a formal application to a specific position is not necessary.[24] *Adkins*, 224 Md. App. at 158; *see Gile v. United Airlines, Inc.*, 213 F.3d 365,

---

[22] PRMC further states that Adkins's suggestion that she could break down boxes of IV supplies "does not translate to the **many** other supply boxes that do not contain smaller, lighter items within." (Emphasis added.) The summary judgment record does not, however, reflect that there are "many" other heavy supply boxes that do not contain smaller items within. On remand, PRMC can certainly present evidence countering Adkins's averment that "[t]he primary heavy item which needed to be handled by the Inventory Control Coordinator on a regular basis were boxes with Intra Venous (IV) fluid bags."

[23] At oral argument, PRMC speculated that Adkins ascertained there would be a vacancy based on her friendship with a recently terminated inventory control coordinator. While faulting Adkins for failing to formally apply for the position, PRMC stated that she "merely" sent an "email before the [inventory control coordinator] position was even posted on the job vacancies website where the hospital posts all its vacancies" and that Adkins "took it upon herself to send an email to the director of the materials management department." If anything, Adkins's taking the initiative to send this email is evidence that she communicated a desire for an accommodation. *See supra*.

[24] As the intermediate appellate court said, "federal courts have even reached the broader conclusion that the obligation to reassign in the context of a failure to accommodate claim is not even limited to reassigning the employee to an actual vacant position." *Adkins*, 224 Md. App. at 158 (citing *Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1019 n.5 (8th Cir. 2000) (stating that "vacant position"

33

374 (7th Cir. 2000) (employer could not refuse to reassign an employee to a day shift just because she did not fulfill the "technical requirement" of casting a bid for a day shift while she was on medical leave).[25]

For these reasons, we hold that there were material disputes of fact as to the essential job functions of an Inventory Control Coordinator, and without a determination of those, summary judgment should not have been entered in favor of PRMC. Therefore, we will affirm the judgment of the Court of Special Appeals.

Adkins does not fare so well with respect to the other two positions she sought, as discussed below.

**Core Technician**

Although heavy lifting was at issue in the inventory control coordinator position, it becomes prominent in the core technician job. PRMC's written job description for the core

---

includes those positions that the employer reasonably anticipates becoming vacant shortly)); *see also Dark v. Curry Cnty.*, 451 F.3d 1078, 1089–90 (9th Cir. 2006) (adopting Tenth Circuit precedent that "an employer must consider not only those contemporaneously available positions but also those that will become available within a reasonable period.")

[25] PRMC highlights that COMAR § 14.03.02.05(B)(5) stipulates that reassignment is a reasonable accommodation provided it "is available under the employer's existing policies or practices." PRMC points to its transfer policy and leave policies. Its transfer policy states that the "Medical Center will seek to fill every position with the best-qualified candidate," but that "[i]nternal candidates may be given priority consideration if they possess the qualifications, experience necessary and requisite skills and competencies required for the position." PRMC's personal leave policy provides that "[e]mployees are not guaranteed reinstatement from personal leave," but that "the Medical Center will attempt to reinstate employees into their former or an alternate position for which they are qualified." In light of the material dispute of whether Adkins could perform the essential functions of the inventory control coordinator position, we fail to see how considering Adkins for reassignment violates these policies.

34

technician position provides that 2/3 of the time lifting is spent lifting items up to 24 pounds and that 1/3 of the time is spent lifting items up to 50 pounds. Adkins, nonetheless, questions whether lifting is actually an essential function of the position. A current PRMC core technician testified in her deposition that the job requires extensive lifting and that she handles five to ten, 30 to 50-pound items by herself on average daily. Laura McIntyre, Operations Room Materials Manager and supervisor of the core technicians, also testified that the position required regular lifting, including lifting of items weighing 25 to 30 pounds. Additionally, the written description quantifies the time spent standing and sitting—2/3 standing, 2/3 walking, and under 1/3 of the time sitting—fractions that do not favor Adkins.[26]

Unlike the inventory control coordinator job, Adkins has no prior experience with the core technician position that would permit her to factually dispute the heavy lifting, standing, and walking required. Nor did she offer as witnesses any prior occupant, supervisor, or expert who could offer material testimony relating to the specifics of this job. *Cf. Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 147–48 (3d Cir. 1998) (reversing summary judgment where plaintiff offered vocational expert who, basing his opinion in part on a Department of Labor publication, opined that "patient care, not heavy lifting of patients, is the essential function of registered nursing"). Without relevant evidence disputing PRMC's written job description or its witnesses regarding the weight of items

---

[26] These fractions in the written job description presumably add up to more than 100% because they constitute the maximum potential percentage of time spent in those physical activities.

lifted or frequency of lifting, carrying or walking, Adkins failed to meet her burden to create a material dispute of fact on the issue of whether extensive lifting of heavy items is an essential function of the core technician position. *See Laurin v. Providence Hosp.*, 150 F.3d 52, 59 (1st Cir. 1998) ("[S]ince an ADA plaintiff ultimately must shoulder the burden of establishing that she was able to perform all essential functions of her position, at summary judgment [the plaintiff] bore the burden of adducing competent evidence from which a rational factfinder could have found in her favor.").

We reach a different conclusion about this job than the inventory control coordinator position because in the latter Adkins was able to draw on her personal knowledge to dispute the extent of walking and carrying, and weight of the items lifted, as well as offer up how she would break down the heavy boxes into less than 5 pound IV bags. Thus, she presented testimony challenging the employer's written job description to which we normally defer. *See Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F. Supp. 641, 660 (D.D.C. 1997), *aff'd*, 132 F.3d 1481 (D.C. Cir. 1997) ("[C]ourts defer 'to the employer's judgment as to what functions of a job are essential'"); 42 U.S.C. § 12111(8) ("[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."). She offered no such testimony regarding the core technician job. Because Adkins was restricted to "[l]ifting 10 pounds maximum and occasionally lifting and/or carrying small articles and occasional walking or standing," as a matter of law, she could not perform the essential functions of the core technician position.

Adkins suggests that lifting was a "marginal" part of the core technician job notwithstanding PRMC's written job description and testimony from a current core technician and supervisor detailing the length of time spent lifting. She notes that another core technician obtained assistance lifting from coworkers and that this "brings into question . . . whether the lifting was actually an essential function of the position." Evidence that another core technician received assistance lifting from coworkers could only be relevant on the issue of essential function if there were also evidence that PRMC knew about and acquiesced in this assistance. *See Phelps v. Optima Health, Inc.*, 251 F.3d 21, 26 (1st Cir. 2001) (affirming summary judgment against plaintiff despite understandings between nurses in unit—not with the employer medical center—that allowed ADA plaintiff nurse to work despite disability). Adkins has directed us to no such evidence.

Adkins nevertheless maintains that she could have performed the essential functions of the core technician position with a reasonable accommodation and proposes that the heavy lifting "could have been waived." This suggestion, however, hinges on the supposition, already rejected, that heavy lifting is not an essential function of the core technician position. PRMC was under no obligation to "waive" this duty. COMAR § 14.03.02.02(B)(10)(a) ("'Qualified individual with a disability' means an individual with a disability who [w]ith or without reasonable accommodation **can perform the essential functions** of the job . . . .") (emphasis added); *see Champ v. Balt. Cnty.*, 884 F. Supp. 991, 999 (D. Md. 1995) (stating that an employer is not required to eliminate the essential functions of a job), *aff'd*, 91 F.3d 129 (4th Cir. 1996); *Mason v. Avaya Commc'ns, Inc.*,

357 F.3d 1114, 1122–23 (10th Cir. 2004) ("We have consistently held . . . that an employee's request to be relieved from an essential function of her position is not, as a matter of law, a reasonable or even plausible accommodation.") (citations omitted); *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1528 (11th Cir. 1997) (police department with three detectives not required to eliminate essential function of crime scene investigation for disabled detective).

In a similar vein, Adkins also suggests that she "could have obtained assistance from other Core Technicians with the lifting" as a reasonable accommodation. An employer, however, is not required to reallocate job responsibilities to another employee when doing so would shift the essential functions of the position. *See Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1112–13 (8th Cir. 1995) ("An employer need not reallocate the essential functions of a job, which a qualified individual must perform") (emphasis omitted). *See also Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 140 (2d Cir. 1995) (observing that an employer is not required to accommodate an individual with a disability by eliminating essential job functions, and that "having someone else do part of a job may sometimes mean eliminating the essential functions of the job").

Adkins's physical condition precludes her from lifting over 10 pounds, yet the core technician position involves daily lifting of items predominantly weighing more than 10 pounds. In light of the large extent of heavy lifting required for the core technician position, enlisting the aid of coworkers to lift such items exceeds assistance and crosses into a shifting of responsibility. Consequently, we reject this proposed accommodation because it would necessitate a reallocation of the essential functions of the core technician position.

*See Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1125 (10th Cir. 1995) ("An accommodation that would result in other employees having to worker [*sic*] harder or longer hours is not required.").

On remand, Adkins will not be permitted to rely on the position of core technician to establish that she could have been reasonably accommodated.

**Patient Service Rep – Medical Group**

The Patient Service Rep – Medical Group ("PSR") position required a minimum of three years of experience in secretarial work and experience with Microsoft Office was preferred. Adkins posits that she had acquired the skills necessary for the PSR position while working as an inventory control assistant and that her experience as an inventory control assistant "clearly translates and fulfills the three years of secretarial experience[] required by the PSR position." We are not persuaded. In contrast to the three years of secretarial work experience required for the PSR position, the inventory control assistant position requires a bachelor's degree or four years of medical/surgical supply or logistics experience. PRMC's written job description for the inventory control assistant position states in pertinent part:

> Responsible for maintaining control of the inventory asset account in the Cardiac Cathorization and Electrophysiology labs. This includes overseeing the daily ordering, receiving, and issuing functions. It also includes completing all adjustments, physical inventories, cycle counts, and par level distributions. Must work closely with finance to maintain integrity between physical and perpetual inventory. Assists where necessary in the ordering of inventory items.

Adkins did not testify that she worked as a secretary or possessed the requisite skills. Her

39

argument presumes that the skills of a secretary are the same as those of the inventory control assistant. In the absence of evidence so suggesting, or otherwise generating a dispute of material fact, we disagree with Adkins that her experience as an inventory control assistant or store storekeeper "clearly translates and fulfills the three years of secretarial experience[] required by the PSR position." Because Adkins is not qualified for the PSR position, this is not a reasonable accommodation and Adkins will not be permitted to rely on it on remand.

### Failure to Make a Reasonable Accommodation

The last element a plaintiff must prove to make a prima facie case for a failure to accommodate claim is that the employer failed to make a reasonable accommodation. As with the other three elements of the prima facie case, an employee bears the burden in proving that an employer failed to make a reasonable accommodation. *Gaither*, 94 Md. App. at 583. PRMC correctly points out that an employer must only provide a reasonable accommodation and not the accommodation of the employee's choice. *See Rehling v. City of Chicago*, 207 F.3d 1009, 1014 (7th Cir. 2000).[27] PRMC relies on COMAR § 14.03.02.05(B)(7), which specifies leave as an example of a reasonable accommodation, and contends that it accommodated Adkins by providing 14 weeks of additional leave after her FMLA expired. It charges that the intermediate appellate court "literally plucked 'reassignment' from the non-exhaustive list of reasonable

---

[27] It should be noted that after engaging in an individualized assessment, an employer may decide to provide an employee's preferred accommodation because it best serves the needs of the individual *and* the employer. For example, an employee's preferred accommodation may be one that is least expensive to the employer or the easiest to provide.

40

accommodations listed" in COMAR and "anointed it as the preferred reasonable accommodation."

Although leave may, in some circumstances constitute a reasonable accommodation for the time period that the employer offers it, providing leave as a temporary accommodation does not permanently relieve an employer of the duty to accommodate. If a reasonable accommodation remains necessary when the employee returns to work, the employer must still provide a reasonable accommodation. *See Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 650 (1st Cir. 2000) (asserting that factors to be considered as to whether requests for leave of absence are unreasonable include "where, upon the employee's return to work, she would be unqualified") (citing *Tyndall v. Nat'l Educ. Ctr., Inc.*, 31 F.3d 209, 213–14 (4th Cir. 1994)); *see also Kitchen v. Summers Continuous Care Ctr., LLC*, 552 F. Supp. 2d 589, 597–98 (S.D.W. Va. 2008) (granting summary judgment to employer when employee did not offer sufficient evidence that extended medical leave would have enabled her to perform the essential functions of her job).

After visiting her physician on January 12, 2012, before her extended leave was set to expire in February, Adkins informed her supervisors that she was still restricted to "light duty," and could only perform "[s]edentary work: [l]ifting 10 pounds maximum and occasionally lifting and/or carrying small articles and occasional walking or standing." Adkins's presenting her supervisors with an updated doctor's note reiterating her restrictions well into the 14-week extended leave is evidence that she was unable to perform the essential functions of the storekeeper position, even with the additional leave. Because providing leave as a temporary accommodation does not permanently relieve an

41

employer of the duty to accommodate if a reasonable accommodation remains necessary when the employee returns to work, *Garcia-Ayala*, 212 F.3d at 650, Adkins has presented sufficient evidence to create a factual dispute as to whether the 14 weeks of additional leave was a reasonable accommodation. We, therefore, reject PRMC's assertion that the intermediate appellate court "placed reassignment as the reasonable accommodation of first resort."

### Intentional Disability Discrimination

In order to establish a prima facie case of intentional disability discrimination, an employee must show: (1) that he or she had a disability; (2) that notwithstanding the disability, he or she was otherwise qualified for the employment, with or without reasonable accommodation; and (3) that he or she was excluded from employment on the basis of his or her disability. SG § 20-606(a)(1); COMAR § 14.03.02.04(A)(2). Thus, unlike her reasonable accommodation claim, in her disability discrimination claim, Adkins must show PRMC's discriminatory intent. *See Pullman-Standard v. Swint*, 456 U.S. 273, 288–89 (1982) (in an intentional employment discrimination action, a showing of intent to discriminate is required). Intent to discriminate can be proven by circumstantial evidence. *See Burnell v. Gates Rubber Co.*, 647 F.3d 704, 708 (7th Cir. 2011) (circumstantial evidence that discriminatory intent motivated firing "may include suspicious timing; ambiguous statements; behavior or comments directed at others in the protected class; and evidence that similarly situated employees outside the protected class received systematically better treatment").

PRMC claims that it did not terminate Adkins on the basis of her disability, but

42

rather because she exhausted 26 weeks of leave. PRMC proffers that the evidence establishes that her supervisors never considered her disabled so she could not possibly have been terminated because of her disability.

Our earlier discussion dispels this rather simplistic argument that ignores the employer's obligations under FEPA to reasonably accommodate Adkins. In its briefs, PRMC does not dispute that Adkins was disabled, whereas Adkins has offered evidence suggesting she was disabled. Moreover, Adkins has offered circumstantial evidence to support her claim that she was fired because of her disability—that PRMC terminated her, knowing she was at the time restricted to light duty, and simultaneously ignored its responsibility to reasonably accommodate her. *See Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000) ("[U]nreasonable delay in providing an accommodation can provide evidence of discrimination"); *Logan v. Matveevskii*, 57 F. Supp. 3d 234, 271 (S.D.N.Y. 2014); ("[C]ourts have held that an unreasonable delay itself [of an accommodation] might be evidence of discriminatory intent"); *cf. Burnell*, 647 F.3d at 708. Thus, in this context, PRMC's conduct underlying Adkins's failure to accommodate claim also supports her prima facie claim for intentional disability discrimination because it could provide circumstantial evidence of PRMC's intent to discriminate. *See Schwertfager v. City of Boynton Beach*, 42 F. Supp. 2d 1347, 1356 (S.D. Fla. 1999) ("A crucial ingredient in all actions alleging discriminatory treatment by an employer based on conduct proscribed by the ADA, is proof of discriminatory motive.") (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 325 n.5 (1977)). Considering the record in the light most favorable to Adkins, we conclude that a factfinder may infer that she was terminated

43

because of her disability.  *See also Pullman-Standard*, 456 U.S. at 288 ("Treating issues of intent as factual matters for the trier of fact is commonplace."); *cf. Questar Homes of Avalon, LLC v. Pillar Constr., Inc.*, 388 Md. 675, 687 (2005) ("Whether there has been a waiver of a contractual right involves a matter of intent that ordinarily turns on the factual circumstances of each case.").

## Conclusion

On a motion for summary judgment, the moving party bears the burden of demonstrating that no genuine disputes of material fact exist.  *Mathews*, 435 Md. at 598. All ambiguities are to be resolved and all reasonable inferences drawn in favor of the nonmoving party.  *Id.*  Viewing the record in light of this standard, we conclude that there are disputes of material fact with respect to the issues of whether: (1) Adkins was qualified to perform the essential functions of the inventory control coordinator with or without a reasonable accommodation, and (2) whether Adkins was terminated because of her disability.  Accordingly, we affirm the Court of Special Appeals' judgment and remand for further proceedings consistent with this opinion.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.  CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.  COSTS TO BE PAID BY PETITIONER.**